**BANK OF AMERICA v. WHITNEY–CENTRAL NAT. BANK (two cases).**\*

(Circuit Court of Appeals, Fifth Circuit. July 27, 1923.)

Nos. 4014, 4015.

1. **Banks and banking** ⟐⟿191—**Letter of credit may be unconditional, or subject to such conditions as bank prescribes.**

   Bank may issue letter of credit unconditionally, without requiring presentation of documents, or may prescribe such conditions and require such documents as it sees fit.

2. **Banks and banking** ⟐⟿191—**When letter of credit does not require fact to be shown by documents, it is unconditional as to that fact.**

   When particular fact is not required by letter of credit to be represented by documents, the letter of credit is unconditional as to such fact, and issuing bank is presumed to rely on representation of the person in whose favor the credit is issued, unless the fact is one which required document should disclose.

3. **Banks and banking** ⟐⟿191—**Letter of credit held not to require presentation of abstract or copy of consular invoice.**

   Letter of credit for price of sugar sold by one broker to another, and not imported by either, and from which requirement for bills of lading and consular invoice had been stricken, and custom house permit and delivery order substituted, *held* not to require abstract of copy of consular invoice.

4. **Banks and banking** ⟐⟿191—**Letter of credit held not to make it essential that sugar be purchased outside the United States and imported for account of buyer.**

   Letter of credit for invoice cost of sugar to be purchased for account of B. & Co. *held* not to require that the sugar should be purchased abroad or be imported for account of B. & Co., to avoid supposed application of Federal Control Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛a et seq.)

5. **Banks and banking** ⟐⟿191—**Letter of credit held not to require documentary evidence of date of shipment, or weight or description of goods, other than seller's invoice and letter of advice.**

   Letter of credit covering purchase price of sugar, and providing for payment on drafts and letter of advice, accompanied by custom house permit and delivery order, *held* not to require showing by documents other than seller's invoices and letters of advice as to dates of shipment, or description or weight of the sugar, in view of 38 Stat. 181, as to consular's invoices, and Rev. St. § 2870 (Comp. St. § 5558), as to custom house permits.

6. **Banks and banking** ⟐⟿191—**Letter from seller to buyer held not to bind bank, to which letter of credit had been transferred as collateral security.**

   Where letter of credit for purchase price of sugar did not require that drafts be accompanied by bills of lading, letter from seller to buyer, stating that bills of lading or copies thereof would be furnished, did not bind bank, with which the letter of credit had been deposited as collateral security, in absence of its consent or knowledge.

7. **Banks and banking** ⟐⟿191—**Not essential that description in custom house permit be in language of letter of credit.**

   While under Rev. St. § 2870 (Comp. St. § 5558), custom house permit should contain description of goods, it was not essential that permits required by letter of credit contain description in language of letters of credit, as neither seller nor transferee of the letter of credit could compel such description.

---

⟐⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

\*Rehearing denied November 2, 1923.

**8. Banks and banking** ☜191—**Bank, refusing payment of drafts drawn under letters of credit on other grounds, held not justified because of signatures to drafts and accompanying documents.**

Bank, issuing letter of credit for price of sugar and refusing to pay drafts on ground not relating to manner of execution of drafts and accompanying documents, but to the documents themselves, could not justify its refusal because they were signed by attorney or agents.

**9. Banks and banking** ☜191—**Custom house permit held not to contradict invoice as to quality of sugar.**

Under 38 Stat. 114, par. 177, relative to duty on sugar, custom house permit, describing sugar as refined granulated sugar, test 96%, and showing rate of duty was 1.36 cents per pound, showed that duty was paid on highest grade of sugar, and did not contradict invoice accompanying draft drawn under letter of credit, and describing the sugar as Java white sugar.

**10. Banks and banking** ☜191—**Notation on custom house permit held not to justify refusal of payment under letter of credit.**

It was not within power of custom officials to limit use of imported sugar, and notation on custom house permit that sugar was for local consumption and not for refinery could safely be ignored, and did not justify bank in refusing payment of drafts drawn under letter of credit.

**11. Banks and banking** ☜191—**Delivery order accompanying draft held sufficient, when signed by another and adopted by seller.**

Under letter of credit for price of sugar requiring drafts to be accompanied by custom house permit and delivery order, delivery order, signed by party from which seller purchased the sugar, and adopted by seller by attaching it to its draft, *held* sufficient.

**12. Banks and banking** ☜191—**Delivery order accompanying draft held not rendered insufficient by statement as to weighing by particular party.**

Delivery order for sugar accompanying draft drawn under letter of credit was not insufficient because of printed statement thereon that sugar was to be weighed by named party; it not indicating that goods had not been weighed or preventing delivery of the goods.

**13. Banks and banking** ☜191—**Insurance certificate accompanying drafts drawn under letter of credit held to describe goods sufficiently.**

Insurance certificates, accompanying drafts drawn under letter of credit for price of sugar and describing insured property as 50 tons of sugar from a named vessel, *held* sufficient.

**14. Banks and banking** ☜191—**Delay in presentation of drafts after arrival of sugar held not unreasonable.**

Where drafts drawn under letters of credit for price of sugar arriving in New York on November 3d, and accompanying documents, were presented in New York on November 10th, and in New Orleans, where issuing bank was located, on December 7th, and it had become evident that bank intended to refuse payment, if possible, but it declined to point out any defects in documents, delay in presentation *held* not unreasonable.

**15. Banks and banking** ☜191—**Certificates of customs official held to be treated as part of custom house permit.**

Where custom house permit accompanying draft drawn under letter of credit described goods simply as sugar. but was accompanied by certificate of assistant deputy collector of customs that it was Java white sugar, and that duty had been paid on certain estimated weight, such certificate should be treated as part of the permit.

**16. Banks and banking** ☜191—**Customs official's certificate accompanying permit held not to show draft was excessive.**

Certificate of customs officials, which, with customs permit, accompanied draft drawn under letter of credit, and which stated that duty had been paid on estimated basis of approximately 223 pounds to bag,

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*held* not to show that drafts were excessive, though drawn for greater weight.

17. **Customs duties** ☞97—**Purchaser entitled to take goods free from lien when permit issued.**

Under Rev. St. § 2899 (Comp. St. § 5589), when customs permit is issued, the goods, in contemplation of law, are no longer in possession of customs authorities, and purchaser is entitled to take them free from lien, though duty has not been paid.

18. **Warehousemen** ☞25(4)—**Person with written authority entitled to delivery, when negotiable certificates not issued.**

Under Consol. Laws N. Y. c. 25, § 96, where negotiable warehouse certificates were not issued for goods in warehouse, person with written authority was entitled to delivery.

19. **Banks and banking** ☞191—**Immaterial that sugar not segregated when delivery orders called for entire amount.**

When two delivery orders for goods in warehouse accompanying draft drawn under letter of credit called for entire lot, it was immaterial that the two lots had not been segregated.

20. **Customs duties** ☞97—**Holder of permit for part of lot of sugar entitled to that on which duty paid.**

Where duty had not been paid on entire lot of 5,019 bags of sugar, holder of customs permit for 1,350 of such bags was entitled to those on which duty had been paid, especially as it is not to be supposed that the government would issue permits and refuse to deliver the goods.

21. **Banks and banking** ☞191—**Insurance policy accompanying draft held sufficiently specific.**

Insurance policy accompanying draft for price of sugar drawn under letter of credit and describing the sugar as 1,350 bags of Java white sugar *held* sufficiently specific.

22. **Banks and banking** ☞191—**Description of sugar in customs permit accompanying draft held sufficient.**

Under letter of credit for price of 500 tons of Java white sugar, customs permit accompanying draft and describing the sugar as superior white Java sugar *held* sufficient.

23. **Banks and banking** ☞191—**Customs certificate held not to contradict invoice and delivery order as to weight of sugar.**

Certificate of customs official, accompanying draft drawn under letter of credit, and stating that bill of lading called for 1,043 bags, estimated to weigh an average of 218.66 pounds to the bag, did not contradict invoice or delivery order as to weight of sugar, as it only purported to be an estimate.

24. **Banks and banking** ☞191—**Letter of credit not construed as requiring that customs permit be drawn to order of issuing bank.**

Letter of credit for price of sugar providing for payment on drafts accompanied by custom house permit and delivery order filled up to order of the issuing bank must be construed as requiring only that delivery order be so filled up, as permit only authorizes government's storekeeper to release the goods and could not be filled up to bank's order.

25. **Banks and banking** ☞191—**Letter of credit held not to require insurance against war risk, theft, or loss of goods while in warehouse.**

Letter of credit requiring insurance by seller required only such insurance as was usual, and it was not necessary to tender insurance covering war risk and theft, when the war was over and the sea voyage at an end, or loss of goods from warehouse where there was nothing to indicate that they were in warehouse.

In Error to the District Court of the United States for the Eastern District of Louisiana; Rufus E. Foster, Judge.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Two actions by the Bank of America against the Whitney-Central National Bank. Judgment for defendant in each action, and plaintiff brings error. Reversed, with directions.

Walker B. Spencer and H. Generes Dufour, both of New Orleans, La., and Henry Root Stern and George N. Hamlin, both of New York City (Dufour, Goldberg & Kammer and Spencer, Gidiere, Phelps & Dunbar, all of New Orleans, La., and Rushmore, Bisbee & Stern, of New York City, on the brief), for plaintiff in error.

R. C. Milling, Monte M. Lemann, and J. Blanc Monroe, all of New Orleans, La. (Monroe & Lemann, and Milling, Godchaux, Saal & Milling, all of New Orleans, La., on the brief), for defendant in error.

Before BRYAN and KING, Circuit Judges, and GRUBB, District Judge.

BRYAN, Circuit Judge. These are writs of error, sued out by the Bank of America, plaintiff, to judgments in favor of the Whitney-Central National Bank, defendant. The two suits, each based upon a letter of credit issued by the defendant, were consolidated for trial, and will be disposed of here in one opinion.

April 16, 1920, Ham & Seymour, partners and brokers doing business in New Orleans and New York, and John Barkley & Co., Limited, of New Orleans, entered into the following contract:

"New Orleans, April 16, 1920.

"John Barkley & Co., Limited, City—Dear Sirs: We have this day sold you 500 tons Java white sugar to be shipped 50 tons during July, 135 tons during July-August, 315 tons during August-September, at a price of 22 cents per pound delivered New York City; terms, net cash on presentation of custom house permit and delivery order based on net landed weights at New York. It is understood that you will arrange at once a banker's credit to provide for payment as above, and you will therefore please arrange such a credit in favor of Ham & Seymour, 102 Wall street, New York, for $246,400, to be paid to them in exchange for the above-mentioned documents.

"Yours truly,                                          Ham & Seymour.
"Accepted: John Barkley & Co., Limited,
                  "Henderson Barkley, Treas."

On the next day another contract identical in terms was entered into by the same parties. April 17 the defendant issued two letters of credit, identical in all respects, except that one is numbered 4333 and the other 4334. These letters of credit were issued upon printed forms, on which certain words and lines were stricken out, and certain interlineations made. The forms were filled out in typewriting. Letter of credit No. 4333 is as follows (the typewritten matter being in italics):

"Letter of Credit .No. *4333.*

"Whitney-Central National Bank, of New Orleans, La.

"New Orleans, La. *April 17, 1920.*

"*Messrs. Ham & Seymour. New York, N. Y.*—Dear Sirs: We hereby authorize you to value on *the Whitney-Central National Bank, New Orleans, at sight, payable at the Hanover National Bank, New York* not exceeding in the aggregate *two hundred and forty-six thousand four hundred dollars,* to be used by *you* for invoice cost of *500 tons Java white sugar at 22¢ per lb. duty paid,* to be purchased for account of *Messrs. John Barkley & Co., Ltd., New Or-*

*leans*, or whom it may concern, and to be shipped to *New York*, *50 tons July*, *1920*, *135 tons July, August, 1920*, *315 tons August, September, 1920*. The drafts must be drawn and ~~Bills of Lading~~ dated in *New York*, prior to the *15th* day of *Dec. 1920*, and advice thereof given by you in original and dupli-

custom house permit & delivery order

cate, such advice to be accompanied by ~~bill of lading~~ filled up to the order of the Whitney-Central National Bank, New Orleans with abstract of invoice endorsed thereon, or a copy of invoice accompanying the said bill of lading for the property shipped as above. ~~All the bills of lading issued, except one to be mailed to us and one retained by the Captain of the vessel carrying the cargo, are to accompany the drafts. The original invoice, properly certified by the United States Consul, to be forwarded to us.~~ And we hereby agree with the drawers, indorsers, and bona fide holders of bills drawn in compliance with the terms of this credit, that the same shall be duly honored on presentation at the office of *the Whitney-Central National Bank, New Orleans.*

"$246,400.00.

"We are, dear sirs,

"Whitney-Central National Bank, Foreign Exchange Department,

"[Signed] Royal R. Bastain, Manager.

"N. B.—Drafts must state on their face that they are drawn under Whitney-Central National Bank credit.

"No. *4333*, dated *April 17, 1920.*

"Insurance *by seller.*"

April 16 Ham & Seymour bought from the E. R. Sherburne Company 1,000 tons of white Java sugar, to be shipped at the times and delivered in the quantities specified in their contract with Barkley & Co., and April 22, in order to secure payment therefor, deposited defendant's letters of credit as collateral security with the Bank of America and procured its letter of credit for their account in favor of the Sherburne Company. Objection was raised by the Sherburne Company to the terms of plaintiff's letter of credit, and on April 26 Ham & Seymour wrote to Barkley & Co. a letter which states:

"In accordance with our promise to do our utmost to take care of your Java sugar in New York, we beg to advise that we expect to arrange to get delivery to you there in warehouse, instead of on the docks, where demurrage from failure to get lighters might accrue, and for this purpose we ask that you obtain from your bankers an amendment to the credit they provided for you as follows: 'Payment shall be made in cash or by sight draft against presentation of custom house permit and/or warehouse receipts (duty paid) and delivery order,'"

—and April 28 received from the defendant the following letter:

"Referring to letters of credit Nos. 4333 and 4334, issued in your favor for account of John Barkley & Co., Limited, for $246,400 each: By request of Messrs. John Barkley & Co., we beg to advise you that the above credits have been amended to read: 'Payment shall be made in cash or by sight draft against presentation of custom house permit and/or warehouse receipt (duty paid) and delivery order.'"

May 3 the plaintiff amended its letter of credit in a manner acceptable to the Sherburne Company, and thereafter paid drafts for the full amount authorized by the said letter as amended. As it paid each such draft it accepted from Ham & Seymour their drafts payable to its order upon the defendant, and demanded payment both at New York and New Orleans. The defendant refused payment upon the principal ground that the documents attached were "not in order."

It refused to specify wherein any document failed to comply with its letters of credit.

The plaintiff caused to be sold the sugar it received on its letter of credit and sues for the difference between the amount realized on resale and the aggregate amount of the drafts it received from Ham & Seymour. It has not received any additional payments upon its own letter of credit. The drafts upon the defendant were presented in pairs, and there were three presentations under each of the two letters of credit. Unless otherwise indicated, reference will be made to only one of each pair of drafts and documents.

Each draft was accompanied by a letter of advice in duplicate, Ham & Seymour's commercial invoice and abstract thereof, custom house permit, delivery order, and insurance certificate or policy. The first three of these documents show shipments of the full quantity of sugar of the kind required, within the times prescribed, and at the prices named in the letters of credit. The drafts upon each presentation were for the full amounts authorized. The first pair of drafts were presented October 19 in New York, and October 28 in New Orleans; the second pair were presented November 11 in New York, and December 7 in New Orleans; and the third pair were presented December 13 in New York, and December 15 in New Orleans. The custom house permits show the arrival in New York of the steamships Karimoen on October 11, Enggano on November 3, and Texas Maru on December 7, with consignments of sugar.

Before the first presentation of drafts and documents was made, Ham & Seymour wrote to Barkley & Co. that a copy of the bill of lading, although not stipulated for, would be presented, because it was considered that Barkley & Co. were entitled to proof regarding the actual date of shipment. A copy of the bill of lading covering the first shipment accompanied the drafts, and is dated July 31, 1920, and covers sugar to be shipped by the Karimoen. It recites that four bills of lading had been issued, including one copy for the captain, and was executed by an agent of the company "per pro" the captain. Custom house certificates attached to the two other sets of drafts show that the Enggano bill of lading was issued in August, 1920, and the Texas Maru bill of lading in September, 1920.

The first presentation of drafts and documents was for sugar which arrived on the Karimoen. The plaintiff tendered a custom house permit in which the sugar was described as "refined granulated sugar, test 96°." A notation was made on this permit that the sugar was for local consumption and not for refinery. Direction to the storekeeper to release the goods was duly executed, and the storekeeper's return on the back of the permit is to the effect that the goods were delivered October 21, 1920; but the evidence shows without conflict that this entry by the storekeeper had not been made when the documents were presented at New Orleans. The custom house withdrawal describes the sugar as containing 111,525 pounds, and shows that the rate of duty was 1.36 cents per pound. Minford, Lueder & Co. appear as importers, and signed the withdrawal, but did not fill in the name of the party to whom delivery should be made. The delivery order is signed by W. R. Bassett, as attorney for the Sherburne Company. In

the lower left-hand corner are printed the words, "To be weighed by Geo. J. Hoffmann & Co., N. Y. City." The invoice and letter of credit call for "50 tons, 500 bags, Java white sugar, say 112,000 pounds." The insurance certificates furnished describe "50 tons sugar." .

The second presentation was for sugar which arrived on the steamship Enggano. The custom house permit described it simply as "sugar," but it was accompanied by a certificate from an assistant deputy collector of customs that the sugar described in the permit was "Java white sugar, and that the duty had been paid thereon on the estimated basis of approximately 223 pounds to the bag." The Bankers' Trust Company was named in this permit as importer, and it executed a delivery order on the Pouch Terminal Stores for 1,350 out of a lot of 2,700 bags of Java white sugar. The draft, invoice, and letter of advice were signed per pro. Ham & Seymour, by E. B. Wilson, attorney. An insurance policy in favor of the defendant was also attached.

The third presentation was for sugar which arrived on the Texas Maru. The custom house permit described the merchandise as "superior white Java sugar," but did not designate its weight. However, a certificate from the deputy collector of customs states that the bill of lading calls for 10,043 bags, estimated to weigh an average of 218.66 pounds to the bag. The Old Colony Trust Company appears as importer. The delivery order purports to emanate from it, and was signed by J. J. Sweeney, "for Manager Foreign Department." The draft, invoice, and letter of advice were signed per pro. Ham & Seymour, by E. B. Wilson, attorney. The insurance was in the form of certificates, and did not cover war risk, theft, or goods while in warehouse.

When the plaintiff rested, the District Judge, being of opinion that the evidence failed to show shipments at the times required by the letters of credit, directed a verdict and entered judgment thereon for the defendant.

[1, 2] A bank may issue its letter of credit unconditionally, and without requiring documents, or it may prescribe such conditions and require such documents as it sees fit. Border National Bank v. American National Bank (C. C. A.) 282 Fed. 73. It follows that when any particular fact is not required to be represented by documents the letter of credit is unconditional as to such fact, and in that event the issuing bank is presumed to rely upon the representation of the person in whose favor the credit is issued. But of course it is unnecessary to enumerate or specify in detail facts which it is the office or function of a required document to disclose; for then such facts are called for by the act of requiring such document.

[3] The defendant contends at the outset that its letters of credit require the presentation of copies of consular invoices, and are not susceptible of the construction that the commercial invoices of Ham & Seymour would be recognized. Undoubtedly the printed form used was prepared for import letters of credit. The contention arises out of the attempt to adapt that form to meet the present situation, where one broker was purchasing from another broker portions of consignments of imported goods, and where neither of them was the importer. Barkley & Co. were not entitled to have possession of the bills of

lading, or the consular invoices, and it was doubtless for this reason that the requirements for these documents were stricken out, and custom house permits or warehouse receipts substituted. The purpose of requiring bills of lading and consular invoices is to enable the bank that issues its letter of credit to ascertain whether the copies which accompany the drafts correspond with the originals; but, without originals, copies serve no useful purpose. The words "invoice cost" in the letters of credit clearly refer to the commercial invoice of Ham & Seymour, because the price to be received by them, and not by the importer, is given. The subsequent requirement, that an abstract of invoice be indorsed on the custom house permit or delivery order, appears without anything to indicate a change in the kind of invoice. It is true that the provision "or a copy of invoice accompanying the said bill of lading," upon the form used, has reference to a copy of the consular invoice. But that provision is in the alternative, and is fairly open to the contention that it was left in inadvertently, or at least that it was intended to strike out of it the words "the said bill of lading," and to substitute the words "custom house permit and delivery order," as was done elsewhere. The amendments to the letters of credit, which authorize the use of warehouse receipts, instead of custom house permits, tend strongly to clear up any ambiguity. Upon consideration of the changes in the printed forms, the reasons for making them, and the amendments, we are of opinion that neither abstracts nor copies of consular invoices were required.

[4] It is also argued that it was an essential requirement that sugar should be bought without the United States and imported for the account of Barkley & Co., in order to avoid compliance with the regulations of the Federal Food Administration allowing only nominal profits, in supposed compliance with the Federal Control Act of August 10, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛a et seq.), and to enable Barkley & Co. to sell at a substantial profit. A sufficient reply to this argument is that the letters of credit do not require purchase abroad, and that title to the sugar was not to pass to Barkley & Co. until after it was imported.

[5] The drafts were accompanied by all the documents required by the letters of credit. The defendant insists, although there is no specific requirement to that effect, that it was essential for documents, other than those which originated with Ham & Seymour, to show the dates of shipment, contain a description in the language of the letters of credit, and give the weight, of the sugar. Consular invoices, even if they had been required, need not have furnished information as to dates of shipment, because such invoices may be prepared and executed before shipment. 38 Stat. 181. Bills of lading, which also might have shown when the shipments were made, were not required. Therefore it follows that the defendant must be presumed to have relied upon the representations of Ham & Seymour as to the dates when the goods were shipped.

[6] Ham & Seymour's letter to Barkley & Co., that bills of lading or copies thereof would be furnished, does not bind the plaintiff, in the absence of proof of its consent or knowledge that such offer had been made. Furthermore, the bill of lading for the first consignment,

and the certificates for the other two consignments, contain dates within the times prescribed. If it be conceded that the bills of lading do not affirmatively show the dates upon which the shipments were made, yet they do not show to the contrary, and are consistent with the invoices and letters of advice, which do affirmatively show shipments within the times required.

[7] It is the function of a custom house permit to contain a description of goods, and especially of sugar upon which ad valorem customs duties are imposed. R. S. § 2870 (Comp. St. § 5558). But such description need not, in the absence of a specific requirement to that effect, be in the language of the letters of credit. Neither Ham & Seymour nor the plaintiff could compel the customs officials to describe the sugar in the language of the letters of credit. The amendments authorize the substitution of warehouse receipts, which would not ordinarily give a detailed or accurate description; and while it is true that warehouse receipts were not in fact used, yet the right to use them was given by the amendments, and the intention of the parties as to the description which should be furnished is to be arrived at, not from what was actually done, but from what those holding and acting under the letters of credit had a right to do. We think, therefore, it is sufficient that the invoices and letters of advice emanating from Ham & Seymour contain a correct description of the sugar.

There was no document required whose function it was to show the weights, except the documents which were the representations of Ham & Seymour. A custom house permit is not required to show the weight of merchandise. R. S. § 2870. The weights given in the warehouse withdrawal, in the certificates, and in the bills of lading are all estimated, and do not contradict the invoices, letters of advice, or delivery orders. Unless the contrary be clearly shown, it is to be presumed that the defendant relied upon the representations of Ham & Seymour with respect to any small deficiencies in weights, and that credit would be extended to them if the drafts were slightly excessive under such circumstances.

[8] In our opinion, the defendant is not now justified in its refusal of payment, because delivery orders were signed by Bassett on behalf of the Sherburne Company upon the Karimoen presentation, and by Sweeney on behalf of the Old Colony Trust Company upon the Texas Maru presentation, nor because the drafts, invoices and letters of advice were signed per pro. Ham & Seymour by E. B. Wilson, attorney, upon both the Enggano and the Texas Maru presentations. If failure to object to signatures to documents would not in any case constitute a waiver, it seems clear it does where, as here, the refusal is based upon another ground, which related, not to the manner of execution, but to the documents themselves. Railway Co. v. McCarthy, 96 U. S. 258, 24 L. Ed. 693. Each of the three presentations will now be considered separately.

### Karimoen Presentation.

[9-13] The custom house permit shows that duty was paid upon the highest grade of sugar. 38 Stat. 114, § 177. It does not contradict the invoice. It was not within the power of the customs officials to place

a limitation upon the use of the sugar, and the attempt to do so could safely be ignored.

The defendant contends that the delivery order should have been signed by Ham & Seymour, and not by the Sherburne Company. According to the evidence, Ham & Seymour bought the sugar from the Sherburne Company, who in fact doubtless had the right to sign the delivery order, which was accompanied by a blank withdrawal order signed by the importer. At any rate, Ham & Seymour adopted the delivery order by attaching it to their draft.

The printed legend, that the sugar was to be weighed by Hoffmann, was no part of the delivery order, and could not prevent delivery of the goods. It does not indicate that the goods had not been weighed. The expression, "50 tons, * * * say 112,000 pounds," is not difficult to understand. It can only mean that the tons and pounds named are equivalents. The insurance certificates cover sugar from the Karimoen. The description is sufficient to protect the goods insured.

### Enggano Presentation.

[14] The second set of drafts and documents relate to the shipment by the Enggano, which arrived in New York on November 3. The New York presentation was made on November 10, and that in New Orleans on December 7. The evidence relating to the contents of the documents presented at New York has not been stated, for the reason that some of the objections urged against the New York presentation do not apply to the New Orleans presentation.

The delay after the arrival of the goods was not unreasonable. It had become perfectly evident that because of the decline in the price of sugar the defendant intended to refuse payment of the drafts, if in its opinion it was possible legally to do so. It declined to point out any defects in the papers, and stood upon the indefinite statement that the documents were "not in order." The plaintiff was not entitled to the documents which the defendant now claims should have been presented, but in order to meet every possible objection it proceeded to procure certificates of bills of lading, new delivery orders, and other documents.

[15-17] We are of opinion that the certificates should be treated as a part of the permit. Both were issued by the same official, who could have written upon the permit everything that is contained in the certificate. The description of the sugar in the certificate complies with the letter of credit. It is not made to appear that the drafts were excessive by the circumstance that the estimated weight given in the certificate is one pound less per bag than that shown by the invoice and delivery order and reflected in the amount of each draft. As already held, a custom house permit is not required to show the weight of merchandise, and a delivery order is sufficient which merely identifies by marks or otherwise goods described in the permit. Permits authorizing the release of goods upon which the duty has not been paid are frequently issued, and authority to do so is given to customs officers by statute, upon bond being given to secure any unpaid duty. R. S. § 2899 (Comp. St. § 5589). When a permit is issued, the goods in contemplation of law are no longer in the possession of the customs authorities, and the purchaser is entitled to take them free of lien,

though the duty has not been paid. It was not required that delivery orders should emanate from Ham & Seymour, and it was entirely proper that such orders should be given by the parties entitled to possession, as shown by documents other than those signed by Ham & Seymour.

[18, 19] While the delivery orders show that the goods had gone into a warehouse, it does not appear that negotiable warehouse certificates had been issued, and, unless they had been, under the laws of New York, a person with written authority is entitled to delivery. N. Y. Consolidated Laws (1909) c. 25, § 96. It would make no difference if the two lots of sugar had not been segregated, because the two orders call for the entire lot.

[20] Each permit called for 1,350 out of 5,019 bags. Although it may be true that the duty had not been paid on the entire lot, yet it is not to be supposed that the government would issue permits and refuse to deliver the goods called for by them. Besides, one presenting the permits would be entitled to take the bags upon which the duty had been paid. It further appears that the delivery orders refer only to the 2,700 bags which had passed out of the possession of the customs authorities and were then stored in a warehouse.

[21] Each insurance policy describes 1,350 bags of "Java white sugar," and is therefore sufficiently specific.

### Texas Maru Presentation.

The third set of drafts and documents relate to the shipment by the Texas Maru.

[22, 23] The description "superior white Java sugar" in the permit substantially complies with the description "Java white sugar" in the letters of credit, and the discrepancy is unimportant. Both the noun adjective "Java" and the descriptive adjective "white" qualify the noun "sugar." A transposition of these adjectives does not indicate a different kind or grade. The weight in the bill of lading certificate purports to be an estimate, and does not contradict the invoice or delivery order.

[24] The permit was not filled up to the order of the defendant, but it could not have been. A permit only authorizes the government's storekeeper to release the goods, and signifies nothing, except that the duty has been paid or secured by bond. Therefore the letters of credit are to be construed as requiring only the delivery order to be filled up to defendant's order.

[25] Only such insurance as would be usual under the circumstances was required. It was not necessary to tender insurance covering war risk and theft. The war was over, the sea voyage at an end, and the carrier would have been responsible in case of theft. There was nothing to indicate that the goods had passed from the ship's dock to a warehouse.

The conclusion is that, under the evidence submitted, the documents presented complied with the requirements of the letters of credit, and therefore were in order.

The judgments are reversed, with directions for further proceedings not inconsistent with this opinion.