**The WICHITA EAGLE AND BEACON PUBLISHING COMPANY, Inc., Plaintiff,**

v.

**PACIFIC NATIONAL BANK OF SAN FRANCISCO, Defendant and Third-Party Plaintiffs,**

v.

**CIRCULAR RAMP GARAGES, INCORPORATED, a corporation, et al., Third-Party Defendants.**

**The PACIFIC COMPANY–ENGINEERS & BUILDERS OF BERKELEY, a corporation, et al., Cross-Complainants,**

v.

**CIRCULAR RAMP GARAGES, INC., a corporation, et al., Cross-Defendants.**

No. 43598.

United States District Court,
N. D. California.
Jan. 12, 1971.

**334**

Lawrence E. Curfman, III, Bledsoe, Smith, Cathcart, Johnson & Rogers, San Francisco, Cal., Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., for plaintiff.

Cooley, Crowley, Gaither, Godward, Castro & Huddleson, San Francisco, Cal., Rockwell, Fulkerson & Clark, San Rafael, Cal., Jonas, Matthews, Pfotenhauer & King, San Francisco, Cal., for defendant.

## OPINION AND DECISION

LEVIN, District Judge.

This action arises from a Complaint filed herein on May 4, 1965, by the Wichita Eagle and Beacon Publishing Company, Inc. ["Wichita Eagle"] against the Pacific National Bank of San Francisco [1] ["Bank"].

### Facts

Beginning in 1962, Wichita Eagle had been a lessee of certain property ["Property"] located in downtown Wichita, Kansas, upon which were three buildings used by the Wichita Eagle for its publication business. In 1960, the then-Wichita Eagle had purchased the assets of a rival newspaper, the Wichita Beacon, and had proceeded to merge the Wichita Beacon into the Wichita Eagle. Among the assets purchased by the Wichita Eagle was a new publishing plant owned by the Wichita Beacon. The Wichita Eagle decided to move its operations to this new plant after the merger and thus freed the Property, upon which its old plant remained, for other development.

Following a period of negotiations, on February 28, 1962, Marcellus M. Murdock and others, lessors of the Property ["Lessors"], entered into a 99-year lease ["Lease"] with Circular Ramp Garages, Inc. ["Circular Ramp"] of the Property. By subsequent amendment the date of the Lease was changed to April 28, 1962.

Paragraph IV(a) of the Lease required Circular Ramp to exercise due diligence to obtain necessary permits and to commence and complete construction on the Property of a parking garage in accordance with a specified time schedule and having a minimum value of $500,000.

Paragraph IV(b) of the Lease required Circular Ramp to deposit cash or government bonds in the amount of $250,000 in a Kansas bank or provide a surety bond, letter of credit, or other form of guaranty in the same amount to guarantee Circular Ramp's performance of paragraph IV(a) of the Lease. Pursuant to this provision, Circular Ramp arranged for the Bank to issue to the Lessors and the Wichita Eagle as beneficiaries an instrument [hereinafter sometimes "instrument"] dated May 9, 1962, and designated "Letter of Credit No. 17084" [see Appendix hereto for full text of the Instrument]. The Bank made and received its usual letter of credit charge for issuing the Instrument.

Circular Ramp thereafter entered into an agreement with the Pacific Company-

---

1. The Pacific National Bank subsequently merged into the Security Bank and following a substitution of names is now known as Security Pacific National Bank.

Engineers & Builders of Berkeley ["Pacific Company"] in May of 1962, whereby the latter would be the contractors for the parking garage to be built. The contract between Circular Ramp and the Pacific Company followed the language of the Lease and required Pacific Company to use due diligence to meet all specified deadlines, prepare all necessary plans, and obtain a building permit from the City of Wichita, Simpson, Stratta and Associates ["Simpson, Stratta"] were retained by Pacific Company in August to work as architects and engineers for the garage. Simpson, Stratta was required to prepare plans and specifications for the garage in form adequate to allow an application for a building permit to be filed with the City of Wichita on or before September 10, 1962.

Simpson, Stratta prepared preliminary plans for the garage and submitted them to the Department of Public Works for the City of Wichita. On July 9, 1962, C. L. McCaig, the Construction Inspection Supervisor for the Department of Public Works, wrote Simpson, Stratta and said that he had reviewed the preliminary plans and noted that certain items had to be corrected under the city's building code. McCaig indicated that an alley dividing the Property would not be vacated until the latter part of August.

Simpson, Stratta made certain corrections in the plans and submitted them in August of 1962. On September 7, 1962, McCaig advised Simpson, Stratta that corrections would be needed on specifications concerning live load requirements for the slabs and columns for the proposed garage in order to comply with the Wichita Building Code. McCaig requested that the new plans and computations be submitted to him. Simpson, Stratta responded on September 12, 1962, and provided part of the required information. On September 17, 1962, McCaig wrote Simpson, Stratta and said that the specifications as to reduction of live loads for the columns would be permissible, but that no such reductions could be approved for the floor slabs.

Counsel for the Wichita Eagle wrote counsel for Circular Ramp on October 25, 1962, and said that the City Commission of Wichita had given final approval as of October 23, 1962, to vacation of the alley dividing the Property.

On October 30, 1962, the Manager of the International Department of the Bank wrote Circular Ramp and inquired whether under the circumstances the required building permit had been obtained or whether it would be in order for the Bank to reduce the principal sum of the Instrument to $50,000 in accordance with its reduction provision. In response to this letter, John Malone, the President of Circular Ramp, and counsel for Circular Ramp decided to go to Wichita on November 4, 1962, to ascertain the status of the entire project.

McCaig again wrote Simpson, Stratta on November 8, 1962, calling attention to the earlier letter of September 17. McCaig reminded in closing that no building permit could be issued until the matters referred to in the September 17 letter were corrected.

Simpson, Stratta responded to McCaig on November 21, 1962, and offered to satisfy the required changes by substituting a stronger grade of reinforcing steel in the floors and walls of the proposed garage. Simpson, Stratta said that an answer to McCaig's letters of September 17 and November 17 had been delayed pending some other revisions which were being contemplated but which were later abandoned.

On November 29, 1962, counsel for the Wichita Eagle notified the Bank that Circular Ramp had not begun the rental payments which were to commence under the Lease on November 1, 1962, and that all conditions precedent to the effectiveness of the Lease had materialized.

By a letter dated December 10, 1962, Circular Ramp informed the Bank that the latter should terminate the "Letter of Credit No. 17084," giving as the reason therefor the fact that the City of Wichita had failed and refused to issue the required building permit, which failure

and refusal Circular Ramp was accepting as a final refusal under paragraph a, page 2 of the "Letter of Credit No. 17084." No documentation or other proof accompanied the letter of December 10 to verify the position of Circular Ramp that the City of Wichita had refused to issue a building permit to Circular Ramp. In fact, at that time the City of Wichita had not finally refused a building permit to Circular Ramp and none of the city's agents or personnel had ever stated to the contrary.

Acting upon the Circular Ramp letter of December 10, the Bank wrote the beneficiaries under the Instrument, including the Wichita Eagle, and indicated that the Instrument was to be considered terminated in accordance with the Circular Ramp request.

On December 17, 1962, Glen Lytle, the Superintendent of Central Inspection for the Department of Public Works of Wichita, wrote the Bank (with copies to Simpson, Stratta and the Pacific Company) with respect to the alleged denial of a building permit by the city. Lytle advised that the building permit had not been denied and was ready for issuance upon receipt of the permit fee. Lytle noted that the building permit could have been issued as early as October of 1962 had the requested information been submitted for technical compliance with the city building code. The next day, counsel for the Wichita Eagle also wrote the Bank and said that the City of Wichita had never refused to issue the building permit and stood ready to issue it. The Wichita Eagle therefore deemed the Instrument to remain in full force and effect.

The Bank responded with a letter to counsel for the Wichita Eagle dated January 4, 1963, in which reference was made to an earlier letter from Lytle and McCaig to Simpson, Stratta which indicated that a building permit could not be issued for the proposed parking garage until adjustments were made in the loading of the columns and floor slabs. The Bank called attention to the reduction provision of the Instrument and recited that the Instrument had reduced to $50,-000 because the building permit had not been obtained by October 28, 1962. The Bank said that the Instrument had been terminated on its books and records and requested the beneficiaries to return the original copy of the Instrument. On January 9, 1963 counsel for the Wichita Eagle replied to the Bank that it was in error in asserting that prior to December 10, 1962, the City of Wichita would not issue a building permit, and regarded the Instrument as still in effect.

Despite the dispute over the status of the parties under the Instrument, Circular Ramp had taken possession of the Property under the Lease and had caused the structures existing thereon to be demolished. Circular Ramp made rental payments under the Lease after December 12, 1962. The last such rental payment was made in July of 1963. The total amount of the rent paid was $37,500.03.

The main obstacle faced by Circular Ramp in its effort to construct the parking garage was its failure to obtain adequate financing from any source, although it continued to try to arrange such financing throughout. In a letter to Simpson, Stratta on October 25, 1963, for example, counsel for Circular Ramp referred to a conference held with officers and an engineer of Simpson, Stratta along with said counsel and reiterated the view that there still appeared a good possibility of building the proposed parking garage.

Circular Ramp did not, however, ever pay the fee for or receive a building permit from the City of Wichita for the proposed parking garage. No parking garage was ever constructed on the Property by Circular Ramp.

Because of the defalcation of Circular Ramp, the Lessors executed a new lease of the Property to Macy's on October 30, 1964, the term of which was to start on November 1, 1964. The Macy's lease was for a 30-year period with renewal options to be available for six 10-year periods with contemplated renegotiations of the rental provisions. Also on October 30, 1964, the Lessors and Wichita Eagle executed a "Termination Agreement" and

an assignment to the Wichita Eagle of all rights under the letter of credit. During the period from November 1, 1962 to October 30, 1964, Wichita Eagle as lessee of the Property had paid to the Lessors rent in the amount of $226,000 before credit of $37,500.03.

The Property is located very near the heart of the downtown area of Wichita and kitty-corner to the Macy's store. The initial decision by the Wichita Eagle to have a parking garage erected on the Property stemmed both from the belief that the necessity of such facilities would make a garage a wise investment and the interest expressed by Macy's in having such a garage near its store. In fact, one of the reasons tendered by Simpson, Stratta for the failure to obtain a building permit was the fact that negotiations were taking place at the times pertinent with Macy's concerning its desire to have an overhead bridge going from the proposed parking garage to its store.

On March 17, 1965, counsel for the Wichita Eagle wrote the Bank and enclosed notices sent to Circular Ramp and Pacific Company pursuant to the enforcement provisions of the Instrument. Counsel for the Wichita Eagle indicated that the Wichita Eagle proposed to draw a draft pursuant to the Instrument within a few weeks from that date.

On May 3, 1965, Wichita Eagle, as the assignee of the Lessors, presented to the Bank a $250,000 draft drawn upon the "Letter of Credit No. 17084" together with documents specified therein. The Bank refused payment.

### Discussion

#### 1. The Nature of the Instrument Denominated "Letter of Credit No. 17084"

In a joint pre-trial order filed herein on December 9, 1969, and approved by another judge of this court, said judge ruled as a matter of law that the "Letter of Credit No. 17084" was not a letter of credit at all, but was in fact a performance bond or surety agreement subject to the law of performance bonds and surety agreements. Upon transfer of this case to the undersigned for trial, however, the issue of the nature of the "Letter of Credit No. 17084" was reopened and the ruling of the transferor judge was vacated. Upon reopening the Bank offered expert testimony concerning the nature of the Instrument, and the parties submitted additional written authorities in support of their respective positions.

A letter of credit may be broadly defined as an engagement by a bank or other person at the request of a customer that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit.[2]

While in a sense every letter of credit is a form of guaranty, the letter of credit differs from the classical surety undertaking in that it is a primary obligation between the issuer and the beneficiary Asociacion De Az. De Gua. v. United States Nat. Bank of Or., 423 F.2d 638, 641 (9th Cir. 1970). The issuer of the credit is not concerned with the arrangements existing between the beneficiary and issuer's account party. W. Ward & H. Harfield, Bank Credits and Acceptances 134–135 (4th ed. 1958). In construing the terms of a letter of credit, the same general principles apply which govern other written contracts. Venizelos, S.A. v. Chase Manhattan Bank, 425 F.2d 461, 465–466 (2d Cir. 1970); De Sousa v. Crocker First Nat. Bank, 23 F.2d 118, 120 (N.D.Cal.1927), rev'd. on other grounds, 27 F.2d 462 (9th Cir. 1928); 6 Michie on Banks and Banking § 30 at 368 (1952).

2. Other definitions may be found in Second Nat. Bank of Hoboken v. Columbia Trust Co., 288 F. 17, 20 (3d Cir. 1923); A. Davis, The Law Relating to Commercial Letters of Credit 12 (2d ed. 1955); S. Mentschikoff, "How to Handle Letters of Credit," 19 Bus.L. 107 (1963) at 107–108; H. Harfield, "Letters of Credit," 76 Banking L.J. 93, 95–96 (1959).

The history of the commercial development of letters of credit may be found in R. Trimble, "The Law Merchant and the Letter of Credit," 61 Harv.L.Rev. 981 passim (1948).

The Bank contends that the Instrument is not a letter of credit but is instead a performance bond, surety agreement, or other such guaranty. The Bank argues that there can be only two types of letters of credit, "clean" and "documentary." A clean letter of credit requires only the submission of a draft (or drafts) for payment, while a documentary letter of credit requires specified accompanying documents as well. The Instrument here, however, is neither clean nor documentary, the Bank claims, since at least two of its three stated conditions are not documentary. The Bank's approach is, however, too parochial and exalts formalism over commercial reality and usage.

■ The authorities are uniform, for example, that a letter of credit need be in no particular form. *E. g.*, Drinc-O-Matic v. Frank, 141 F.2d 177, 179 (2d Cir. 1944); Pines v. United States, 123 F.2d 825, 828 (8th Cir. 1941); Second Nat. Bank, *supra*, 288 F. at 20–21; Border Nat. Bank of Eagle Pass, Tex. v. American Nat. Bank, 282 F. 73, 79 (5th Cir. 1922), cert. den., 260 U.S. 701, 732, 43 S.Ct. 96, 67 L.Ed. 471 (1922); F. Beutel, Bank Officer's Handbook of Commercial Banking Law 244 (3d (commercial code) ed. 1970). Although letters of credit have been most commonly used in sales transactions, they are certainly not unknown in the context of a construction contract, as here. *See* Fair Pavilions, Inc. v. First National City Bank, 24 A.D.2d 109, 264 N.Y.S.2d 255 (1965), rev'd on other grounds, 19 N.Y.2d 512, 281 N.Y.S.2d 23, 227 N.E.2d 839 (1967); Comment, "Recent Extensions in the Use of Commercial Letters of Credit," 66 Yale L.J. 902, 909 (1957).

Contrary to the Bank's implication, the letter of credit has long been a flexible device utilized by the commercial community to meet its needs in a wide variety of situations. *See* Lamborn v. National Park Bank, 240 N.Y. 520, 148 N.E. 664, 666 (1925); A. Davis, op. cit. at 12, R. Gewolb, "The Law Applicable to International Letters of Credit," 11 Vill.L.Rev. 742 (1966); N. Miller, "Problems and Patterns of the Letter of Credit," 1959 U.Ill.L.F. 162, 190 (1959). Nearly half a century ago the court in Bank of America v. Whitney-Central Nat. Bank, 291 F. 929, 935 (5th Cir. 1923) found that,

A bank may issue its letter of credit unconditionally, and without requiring documents, or it may prescribe such conditions and require such documents as it sees fit. [Citation omitted.] It follows that when any particular fact is not required to be represented by documents the letter of credit is unconditional as to such fact, and in that event the issuing bank is presumed to rely upon the representation of the person in whose favor the credit is issued.

One of the reasons behind the growth and spread of the letter of credit as a commercial tool has been the willingness of the courts to align case law with progressive and current commercial practice. The very type of letter of credit being questioned here by the Bank as a radical departure from traditional usage is but another example of the commercial community pouring old wines into new flasks.[3]

■ In finding the Instrument to be a letter of credit this court gives respect to one of the oldest canons of contractual construction, namely giving effect wherever possible to the intent of the contracting parties. Here the parties intended to enter into a letter of credit arrangement; said letter was drafted by an attorney who was counsel for the Pacific Company and later for Circular Ramp and approved by both the Wichita Eagle and the Bank; the Bank charged and received its usual letter of credit

---

3. It cannot even be fairly said that the letter of credit in question here is unique or even radical in form; a similar form of letter of credit was the subject of a law review article written over a decade ago. See 66 Yale L.J., op. cit. at 902, 921.

charge; and the letter clearly and conspicuously calls itself a letter of credit.[4]

■ Although the question is not free from doubt, the Instrument denominated "Letter of Credit No. 17084" should be treated as a letter of credit and be subject to the law respecting letters of credit to the extent applicable and appropriate.

### 2. The Bank Was Not Justified in Refusing to Pay the $250,000 Draft Tendered by the Wichita Eagle Against the Letter of Credit

The Wichita Eagle claims that the Bank is liable to it for the latter's unjustified refusal to honor the $250,000 draft tendered against the letter of credit. The Bank, on the other hand, contends that the letter of credit terminated or at least reduced in accordance with its own provisions.

#### a. The Letter of Credit Did Not Terminate

■■ Paragraph 3a of the letter of credit provided that the letter would terminate at such time as the City of Wichita refused to issue a permit to construct a circular ramp parking garage in accordance with plans and specifications submitted by Circular Ramp or its engineer or architect on the Property subject to the Lease and failed to issue said permit to either Circular Ramp or its contractor, provided that such refusal was accepted as a final refusal by Circular Ramp or said contractor.

The Bank points to the December 10, 1962, letter from Circular Ramp to the Bank as the basis for the termination argument; in that letter Circular Ramp requested that the letter of credit be terminated because the City of Wichita had failed and refused to issue it a building permit, which failure and refusal it was treating as final. The problem with this argument is that it overlooks the rule that documents submitted incident to a letter of credit are to be strictly construed. Banco Espanol de Credito v. State Street Bank & T. Co., 385 F.2d 230, 234 (1st Cir. 1967), cert. den., 390 U.S. 1013, 88 S.Ct. 1263, 20 L.Ed.2d 163 (1968). The bare letter from Circular Ramp, without any accompanying documentation or other proof, cannot be held sufficient to have terminated the letter of credit under the provision above cited. Even in the

---

4. The Wichita Eagle has emphasized the fact that the letter of credit is entitled "Letter of Credit" and by this fact alone would come within the definition of a letter of credit as used in California Commercial Code § 5102(c). The California Commercial Code is not directly applicable here, however, since the transaction(s) in question took place before its effective date. California Commercial Code § 10101; Templeton Feed & Grain v. Ralston Purina Co., 69 Cal.2d 461, 466 n. 3, 72 Cal.Rptr. 344, 347, 446 P.2d 152 (1968). Moreover, the reliance placed on the Commercial Code's reference to a conspicuous notation of "letter of credit" is overemphasized because that provision was apparently intended to permit banks as well as other parties to bring documents other than documents of title within the coverage of Section 5-102. Official Comment to U.C.C. § 5-102.

Nonetheless, the court does draw guidance from the direction of growth in the field of letters of credit clearly countenanced by both the U.C.C. and its California counterpart. Previous case law did not purport to be exhaustive or final on the question of letters of credit, H. Harfield, "Statutory Rules for Letters of Credit," 1 Bus.L.Rev. 313, 314 (1954), nor does the U.C.C. or the California Commercial Code intend to be the last word on the matter. It is evident that neither the U.C.C. nor the California Commercial Code attempted to codify all past decisional law on letters of credit nor to revolutionize the field. Rather, the purpose was to reiterate a few fundamental principles relating to the law of letters of credit and to present a basis and framework for future development. See Official Comment to U.C.C. § 5-102; C. Williams, Introductory Comment to California Commercial Code, Div. 5, Letters of Credit; C. Funk, Banks and the Uniform Commercial Code 178 (1962); 37 Calif.State B.J. 171 (1962); H. Harfield, "Code Treatment of Letters of Credit," 48 Corn.L.Q. 92, 95, 97 (1962); B. Auerbach, "Letters of Credit—A Concise Codification," 23 Ohio St.L.J. 246, 259 (1962); 50 Am.Jur.2d Letters of Credit § 2 at 399–400.

absence of such documentation the Bank could have easily ascertained whether the City of Wichita had refused to issue a building permit by requesting a document from the city's Department of Public Works so stating, but this it did not do. Therefore, the letter of credit did not terminate.

### b. *The Letter of Credit Did Not Reduce*

■ Paragraph 3a of the letter of credit also provided that it would reduce to a principal sum of $50,000 if Circular Ramp or its contractor wished to continue to try to obtain a building permit after the inability of either to obtain such a permit by October 28, 1962.

Again, however, the Bank was not entitled to reduce the letter of credit merely because of Circular Ramp's undocumented representation to it that no building permit had been or could be issued by October 28, 1962.

### c. *The Bank Was Not Justified in Refusing to Pay the $250,000 Draft*

■ The letter of credit listed three conditions precedent to the payment of any sight drafts presented against the letter: First, that Circular Ramp had failed to perform the terms and conditions of paragraph IV(a) of the Lease; Second, that the payee have sent a written notice to the Pacific Company and Circular Ramp specifying how Circular Ramp had failed to perform the terms and conditions of said paragraph IV(a) of the Lease and have delivered to the signatories for the Bank an affidavit signed by Marcellus M. Murdock stating that the written notices required were sent to the Pacific Company and Circular Ramp, such notices to have been sent more than thirty days prior to the date the draft is drawn; and Third, that either Circular Ramp or the Pacific Company had failed during the thirty days following the delivery of the notices to them to cure any actual default existing under the terms of said paragraph IV(a) of the Lease as so specified in the written notices.

The Wichita Eagle complied with all the conditions precedent sufficient to require that the Bank have honored its $250,000 draft drawn against the letter of credit.

Circular Ramp had failed to perform the terms and conditions of paragraph IV(a) of the Lease in that it had failed to commence or construct the parking garage within the required time and had failed to use due diligence to obtain the necessary building permits for the garage. These were the three reasons stated in the written notices sent to Circular Ramp and the Pacific Company as to how Circular Ramp had failed to meet the terms and conditions of paragraph IV(a) of the Lease. The affidavit required from Marcellus M. Murdock was also submitted to the Bank. Finally, neither the Pacific Company nor Circular Ramp cured the actual defaults existing under paragraph IV(a) of the Lease within the period between the mailing of the required notices on March 17, 1965, and the presentation of the $250,000 draft to the Bank on May 3, 1965, over 30 days later.

### 3. *The Measure of Damages to Which the Wichita Eagle is Entitled*

Finding as we do that the Bank was not justified in refusing to pay the $250,000 draft tendered by the Wichita Eagle, the most difficult question in the case arises: what is the proper measure of damages to be applied? The Wichita Eagle argues that the measure of damages should be the face amount of the letter of credit ($250,000) against which the draft was drawn, and that the actual damages suffered in fact exceeded that amount. The Bank counters that the Wichita Eagle suffered no damage at all because its rights were only as an assignee, because the Macy's lease which was later obtained was more valuable than the Circular Ramp Lease, and because the performance under paragraph IV(a) of said Lease to be guaranteed by the letter of credit was that of the construction of the parking garage, not the covenant to pay rent.

The authorities reveal a considerable amount of divergence and confusion on the issue of computing damages upon an unjustified refusal to honor a draft drawn against a letter of credit.[5] The issue is made murkier still here since what authority does exist deals with damage computations almost exclusively in the sales context.

The general rule, primarily applicable to the sales of goods, is that the proper measure of damages is the face amount of the draft(s) less any offset resulting from the beneficiary's duty to mitigate. Maurice O'Meara Co. v. National Park Bank, 239 N.Y. 386, 146 N.E. 636, 640 (1925); 6 Michie § 34 at 393, 9 C.J.S. Banks and Banking § 183 at 397–398. This general rule does not readily lend itself to the present context, however, because the performance to be secured here was the construction of a parking garage, a circumstance which has neither the liquidity nor the possibility of mitigation to be found in the sales situation.

Thus, if Circular Ramp did not and could not find a new tenant to erect a parking garage on the Property, its damages might well have been the face amount of draft presented, $250,000. To so find, however, would ignore the realities of the situation: Circular Ramp *did* find a substitute tenant within a relatively short time, namely Macy's, and it appears to this court that Macy's was a more desirable tenant than Circular Ramp. Whereas Circular Ramp was only obligated to build a parking garage with a value of $500,000, Macy's did in fact build a parking garage with a value of over $1,000,000.

The Bank offered expert testimony to show that as of April 28, 1965, the value of the Property subject to the Circular Ramp lease was approximately $435,000 while the value of the Property subject to the Macy's lease was approximately $478,000.[6] The expert then testified that taking all factors into account the Circular Ramp Lease was worthy approximately $454,000 and the Macy's lease was worth approximately $541,000.

Accordingly, the court finds that the measure of damages to which the Wichita Eagle is entitled is the face amount of the draft, $250,000, less the enhanced value of the Macy's lease as compared to the Circular Ramp Lease, $87,000, or a total of $163,000, judgment to be entered thereon.

### 4. Findings of Fact, Conclusions of Law and Judgment

The foregoing constitutes the court's findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure. Judgment for plaintiff and against defendant in the sum of $163,000 is hereby ordered.

### APPENDIX

### PACIFIC NATIONAL BANK OF SAN FRANCISCO

International Department
May 9, 1962

Marcellus M. Murdock; Victor Delano; Katherine M. Henderson; Marsh Murdock and Victoria Neff, as the Trustees of the Pearl Jane Murdock Trust; Wichita Eagle, Inc.; and the Prairie Improvement Company, Inc.

Gentlemen:

We hereby establish our Letter of Credit No. 17084 in your favor on the terms and conditions herein set forth for the account of Circular Ramp Garages, Inc. for the total sum of $250,000.00. available by drafts drawn at sight on the Pacific National Bank providing that all of the following conditions exist at

---

5. *See* Comment, "Damages for Breach of Irrevocable Commercial Letters of Credit: The Common Law and the Uniform Commercial Code," 25 U.Chi.L.Rev. 667 *passim* (1958).

6. The difference in valuations between the two leases does not take into account bonus payments made under the Macy's lease which began in its second year and amount to about $2,500 annually, and generously assumed that the parking garage which Circular Ramp would have built was worth $1,000,000.

the time said draft is received by the undersigned:

1. That Circular Ramp Garages, Inc. has failed to perform the terms and conditions of paragraph IV(a) of the lease dated February 28, 1962, as amended to April 28, 1962, between all of you as Lessor and Circular Ramp Garages, Inc. as Lessee, a copy of which lease is attached hereto.

2. That you have sent by registered United States mail, return receipt requested, with all postage and registration fees prepaid, a written notice to Circular Ramp Garages, Inc. at 343 Sansome Street, San Francisco 4, California, and to The Pacific Company Engineers and Builders at 801 Cedar Street, Berkeley, California specifying how Circular Ramp Garages, Inc. has failed to perform the terms and conditions of said paragraph IV(a) of said lease and further that you have delivered to the undersigned an affidavit signed by Marcellus M. Murdock stating

333 Montgomery Street    San Francisco 20,
California    Cable Address: Panabank

that he sent said written notice in such manner to the above Circular Ramp Garages, Inc. and The Pacific Company Engineers and Builders, to which affidavit shall be attached the return receipt from said registered mail delivery, which affidavit and any attached return receipt shall show that said notice was delivered to said Circular Ramp Garages, Inc. and The Pacific Company Engineers and Builders more than thirty days prior to the date the draft is drawn by you against this Letter of Credit.

3. That either Circular Ramp Garages, Inc. of The Pacific Company Engineers and Builders has failed during said thirty days following the delivery of said notice to them to cure any actual default existing under the terms of said paragraph IV(a) of said lease as so specified in said written notice.

The credit extended under this lease shall terminate at the time and upon the happening of any of the following:

a. At the time that the City of Wichita, Kansas refuses to issue a permit to construct a circular ramp parking garage building in accordance with plans and specifications submitted by Circular Ramp Garages, Inc. or its engineer or architect, on the property subject to said lease and fails to issue said permit to either Circular Ramp Garages, Inc. or the contractor hired to construct said building, provided, however, that said refusal is accepted as a final refusal by Circular Ramp Garages, Inc. or by said contractor. However, if Circular Ramp Garages, Inc. or said contractor has been unable to obtain such a permit by October 28, 1962 and either of them wishes to continue trying to obtain said permit, this Letter of Credit shall be automatically reduced at said date to a principal sum of $50,000.00 until terminated by any of the following conditions or events.

b. At the time that the contractor who is to construct said building obtains a performance bond from a surety company licensed to conduct a bonding business in Kansas insuring that said building will be completed in accordance with the plans and specifications therefore within three years after Circular Ramp Garages, Inc. is obligated to take possession of said premises or April 28, 1965, whichever date shall first occur.

c. At the time after such permit from the City of Wichita, Kansas is obtained that no construction loan or take-out loan to finance the construction of said building is obtainable, if the reason that said loan is not obtainable is due to some provision in said lease between you and Circular Ramp Garages, Inc. which you refuse to amend pursuant to the requirements of said Lease. For the purposes of this paragraph it will be deemed that no such construction loan or take-out loan is obtainable if such has not been obtained after application to three lending companies which have theretofore made loans in Kansas for the purpose of constructing buildings or amortizing the cost thereof, if Circular Ramp Garages, Inc. then elects not to apply to any other lending company.

d. At the time that Circular Ramp Garages, Inc. has performed or caused to be performed the terms of said paragraph IV(a) of said lease.

e. At the end of three years from the date of this letter.

Upon termination of the credit established under this letter you are to return the letter to the Pacific National Bank.

This Letter of Credit shall be irrevocable from its date providing that you accept the same within ten days from said date. Your acceptance is to be shown by the receipt by the undersigned of a copy of this letter with your acceptance shown by signing below.

PACIFIC NATIONAL BANK
OF SAN FRANCISCO

/s/ A. G. Cinelli
    A. G. Cinelli    Vice President

/s/ D. Bannatyne
    D. BANNATYNE    for Cashier

The terms of the above Letter of Credit are accepted.

Dated May 17, 1962.

/s/ Marcellus M. Murdock
MARCELLUS M. MURDOCK