**BARCLAYS BANK D. C. O.,**
Plaintiff-Appellee,

v.

**MERCANTILE NATIONAL BANK,**
Defendant-Appellant.

No. 72–1913.

United States Court of Appeals,
Fifth Circuit.

July 3, 1973.

Rehearing and Rehearing En Banc
Denied Aug. 13, 1973.

Hugh W. Gibert, Atlanta, Ga., for defendant-appellant.

Robert D. Feagin, III, Atlanta, Ga., Robert M. McCulloch, Jr., New York City, for plaintiff-appellee.

Before MORGAN, CLARK and IN-GRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

 This appeal has its birth in an action against Mercantile National Bank for dishonor of a draft drawn under a letter of credit issued by Allied Mortgage Consultants, Inc., in favor of Barclays Bank D.C.O. Mercantile's liability is premised on the theory that it confirmed Allied's credit, thereby becoming directly liable on the credit under § 5–107(2) of the Uniform Commercial Code as adopted in Georgia.[1] The broad legal issue, and a question of first impression, presented by this Georgia diversity case is whether under the Uniform Commercial Code a bank can attain the status of a "confirming bank" on the credit of a non-bank issuer. Even though this question is not explicitly answered by the Code, we hold that under §§ 5–103(1)(f) and 5–102(3) a bank may confirm a credit issued by a non-bank, thus becoming primarily liable on the credit under § 5–107(2). The remaining issue is whether the appellant, Mercantile National Bank, did in fact confirm the credit issued by Allied Mortgage Consultants. We hold that Mercantile's letter of June 1, 1970, to Barclays was a confirmation of Allied's letter of credit. Because there are no factual issues which are required to be submitted to a jury, we affirm the lower court's decision, 339 F.Supp. 457 (N.D. Ga., 1972),[2] granting summary judgment to Barclays Bank.

I.

In the spring of 1970 Bay Holding Company Ltd., of Trinidad, W.I., began negotiations with Barclays Bank D.C.O. of New York for a loan of about $400,000 to help finance a real estate development in the Caribbean. Barclays apparently was reluctant to rely solely on the security furnished by Bay Holding because in late May of 1970 Allied Mortgage Consultants, Inc., an Atlanta mortgage broker, issued to Barclays its irrevocable letter of credit in a sum not to exceed $400,000 for the account of Bay Holding. This letter of credit was to expire on June 15, 1971. Allied was at that time (May 1970) a customer of Mercantile National Bank of Atlanta. At Allied's insistence Mercantile simultaneously wrote the letter which underlies this litigation. The full text of this

---

1. The Uniform Commercial Code was adopted in Georgia in 1962, effective April 1, 1963. The text of the Code is contained in Title 109A of the Georgia Code Annotated (1962). For ease of reference we will cite to the 1962 official text of the Uniform Commercial Code as published by the American Law Institute and the National Conference of Commissioners on Uniform State Laws. By adding "109A" as a prefix to all sections cited in this opinion, the reader can convert them to the manner in which they appear in the Georgia Code Annotated.

2. In addition to holding that Mercantile was a confirming bank under the U.C.C. and that Mercantile's June 1, 1970 letter was a confirmation of Allied's credit, the court held that this letter constituted an independent letter of credit. 339 F.Supp. at 460. Our disposition of this case does not require that we reach the question whether Mercantile's letter was an independent letter of credit. We therefore pretermit discussion of this point.

letter is set out in the margin,[3] but the third paragraph—on which this appeal turns—provides:

> "We hereby confirm the letter of credit and undertake to honor any drafts presented to us on or before expiration date of the letter of credit in accordance with the terms and conditions of said letter of credit.
>
> Very truly yours
>
> /s/ Carl M. Harris<br>Executive Vice President"

This paragraph was not a part of the first letter which Mercantile sent to Barclays. It was added by Mr. Harris, the Executive Vice President of Mercantile, after Allied's first letter of credit and Mercantile's accompanying letter were not accepted by Barclays, allegedly because neither conformed to standard banking practice.

Barclays subsequently received a demand note executed by Bay Holding for $350,000 and thereafter transferred this sum to Bay's checking account at Barclays. On August 4, 1970, Allied wrote a letter to Barclays concerning an earlier telephone conversation in which Allied told Barclays that Bay had failed to comply with its agreement with Allied relative to the underlying real estate transaction. This letter "instructed" Barclays "that no further funds are to be drawn against the letter of credit without the written authorization from Allied Mortgage Consultants." Because it had previously transferred the entire $350,000 to Bay's account and believing that no action on its part was necessary, Barclays did nothing with respect to this letter.

There were no further developments until March 3, 1971, when Barclays notified Allied, pursuant to the terms of Allied's letter of credit, that it intended after ninety days to present its draft to Allied for any unpaid indebtedness of Bay Holding on its previously executed promissory note. On May 31, 1971, Barclays presented this note to Bay and demanded payment; it was dishonored and protested. Barclays then exercised its right of set-off by applying funds of Bay Holding on deposit with Barclays against the amount of the note. The resulting unpaid balance was $280,011.65. Thereafter Barclays timely presented its draft for the unpaid amount to Allied under the letter of credit, but this draft was dishonored. Barclays then presented the draft to Mercantile, demanding payment on the theory that Mercantile was a confirming bank on Allied's letter of credit by virtue of its June 1, 1970 letter to Barclays. Mercantile denied liability and this law suit followed.

The district court reasoned that Mercantile's letter was an unambiguous confirmation of Allied's letter of credit, the result of which left Mercantile, after Bay's default and Allied's dishonor, primarily liable for the full $280,011.65 under § 5–107(2) of the U.C.C. as adopted in Georgia. As an alternative holding, the court opined that the letter also made Mercantile an issuer of credit under § 5–103(1)(a), which would also render Mercantile primarily liable.[4] Judgment was entered accordingly and Mercantile appeals.

3.
Mercantile National Bank<br>70 Broad Street, N.W.<br>Atlanta, Georgia 30303<br>June 1, 1970

Barclays Bank Limited D.C.O.
200 Park Avenue
New York, N.Y. 10017

Gentlemen:

We are enclosing an irrevocable letter of credit issued by Allied Mortgage Consultants, 127 Peachtree Street, N.E., Atlanta, Georgia dated June 1, 1970, in the amount of $400,000.00 in your favor for the account of Bay Holding Company Limited.

We can unconditionally confirm this is a valid letter of credit and that they have at all times sufficient funds to honor this commitment.

We hereby confirm the letter of credit and undertake to honor any drafts presented to us on or before expiration date of the letter of credit in accordance with the terms and conditions of said letter of credit.

Very truly yours<br>/s/ Carl M. Harris

CMH/ac Executive Vice President

4. *See* note 2, *supra.*

## II.

We turn initially to the question whether a bank can incur the obligations of a confirming bank under the U.C.C. on a credit issued by one other than a bank. Before reaching this question however, we must make certain that the letter of credit issued by Allied in favor of Barclays is a letter of credit under the Code. This may seem an unnecessarily simplistic starting point, but if Allied's letter is not within the Code it would be unnecessary to even consider whether Mercantile can write a letter of confirmation under the Code.

One of the most important sections in each of the nine Articles of the U.C.C. is the section, or sections, which set out the scope of that particular Article. It is here that a court must look to determine whether the Code is even arguably applicable to a given transaction. While it might be concluded, after a complete analysis, that the Code does not apply to a transaction, that analysis should not begin without first determining that the transaction is of a kind generally governed by the U.C.C. Section 5–102, the scope section of Article 5, reads as follows:

(1) This Article applies

 (a) to a credit issued by a bank if the credit requires a documentary draft or a documentary demand for payment; and

 (b) to a credit issued by a person other than a bank if the credit requires that the draft or demand for payment be accompanied by a document of title; and

 (c) to a credit issued by a bank or other person if the credit is not within subparagraphs (a) or (b) but conspicuously states that it is a letter of credit or is conspicuously so entitled.

(2) Unless the engagement meets the requirements of subsection (1), this Article does not apply to engagements to make advances or to honor drafts or demands for payment, to authorities to pay or purchase, to guarantees or to general agreements.

Allied's letter, set out in the margin,[5] "conspicuously states that it is a letter

---

5. The full text of Allied's letter to Barclays reads as follows:

> Allied Mortgage Consultants
> Candler Building,
> 127 Peachtree Street N.E.
> Atlanta, Georgia 30303
> A.C. 404–523–8406
>
> Barclays Bank D.C.O.
> 300 Park Avenue
> New York, U.S.A.
> Loan: A6270–6SB
>
> 1st June, 1970
> Dear Sirs,
> We hereby authorize you to draw on us at sight for any sum not exceeding U.S. Dollars 400,000 (four hundred thousand) for account Bay Holding Company Limited of Trinidad W.I.
> We must have ninety (90) days notice of your intent to present the draft (which notice is cancellable), which draft must be presented to us at our bankers, Mercantile National Bank, 70 Broad Street N.W., Atlanta, Georgia, not later than June 15, 1971, after which date this letter of credit will expire. When presented the draft must be accompanied by:
> This letter of credit.
> A signed statement to you to the effect that the amount for which the draft is due and payable by Bay Holding Company Limited to you on account of loans from you to it, which matured on or before 31st May, 1971 and are past due and unpaid despite due presentation for payment.
> The draft except as otherwise expressly stated herein is subject to uniform custom and practice for Documentary Credits (1962 Revision) International Chamber of Commerce Brochure 222. The proceeds paid under the draft are to be remitted as follows:
>
> Credit: Barclays Bank D.C.O.
> 300 Park Avenue
> New York 10022
>
> We hereby agree that the draft drawn in compliance with the terms of this Letter of Credit will be duly honored upon presentation and delivery of documents as specified and we hereby waive any rights to defer honor of such draft. This letter of credit is irrevocable.
>
> Allied Mortgage Consultants, Inc.
> By (Illegible) LS
> President
>
> Attest:
> Helen L. Montgomery
> Secretary

of credit," thus compelling the conclusion that it is within the scope of Article 5 by virtue of § 5–102(1)(c).

■ For analytical purposes it is also necessary to ascertain whether Allied's letter comes within the Code definition of a letter of credit. Section 5–103(1)(a) provides this definition as follows:

(1) In this Article unless the context otherwise requires

 (a) "Credit" or "letter of credit" means an engagement by a bank or other person made at the request of a customer and of a kind within the scope of this Article (109A–5–102) that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit. A credit may be either revocable or irrevocable. The engagement may be either an agreement to honor or a statement that the bank or other person is authorized to honor.

Allied's letter is an "engagement by [a person other than a bank] made at the request of a customer and of a kind within the scope of this Article (§ 5–102) that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit." It is therefore apparent that Allied's letter to Barclays is a letter of credit within the definition and scope of Article 5.

With this preliminary determination aside, we are now in a position to confront the central legal issue—whether Mercantile can confirm this credit which was issued by a non-bank. This issue arises as a result of the definition of a confirming bank in § 5–103(1)(f).

"A 'confirming bank' is a bank which engages either that it will itself honor a credit already issued by another bank or that such a credit will be honored by the issuer or a third bank."

Mercantile argues that by the terms of this definition it cannot become a confirming bank under the U.C.C. This definition is read as precluding the conclusion that a bank can confirm a credit issued by a non-bank; the corollary is, of course, that a bank can only confirm a credit issued by another bank. Mercantile reaches its position by the following analysis which we paraphrase from Mercantile's appellate brief. (A) Section 5–103(1)(f) is divided into two parts: the first part precedes the conjunction "or" and the second part follows it. Mercantile is not within the first part because Allied issued the only letter of credit involved in this case, and Allied is obviously not a bank. Therefore, Mercantile did not engage that it would honor a credit "already issued by another bank." (B) Turning to the second part of the definition, that following "or", the problem is the meaning of "such a credit." The conclusion is inescapable that "such a credit" means a credit "already issued by another bank." Therefore, just as in the first part of the definition, the second part of the definition contemplates confirmation of a credit only if it has been issued by a bank.

As frosting for its analysis Mercantile adds that the word "issuer" as used in this definition can only refer to a bank, even though a non-bank can generally be an issuer under the Code, § 5–103(1)(c), because "if it were not so, the word 'third' . . . would be mischievous." [6] The argument continues as follows: "The *first* bank, according to Barclays is Mercantile: a confirming bank is a bank which, etc. Reference is made to a *third* bank. Where is the second one? Obviously, the *issuer* is the second bank." [7]

---

6. Appellant's brief at 14.

7. *Id.* Mercantile also argues by analogy that because the definition of an advising bank in § 5–103(1)(e) ("an advising bank" is a bank which gives notification of the issuance of a credit by another bank) seems to preclude becoming an advising bank except in relation to a credit issued by another bank, the same

To summarize, Mercantile's position is that the factual events in this case do not fit the semantic pattern of § 5–103(1)(f), that the operative facts present here do not fall within the literal definition of a confirming bank. A fortiori, therefore, Mercantile is not a confirming bank under the Code. And if Mercantile is not within the Code definition of a confirming bank, then it is impossible for it to incur the obligations of a confirming bank under § 5–107(2).

■ Even though Mercantile's analysis is cogent, it is defective in one significant respect. Mercantile fails to look beyond the words embodied in the definition of a confirming bank. It fails to ask the crucial question—what policy justification is there for holding that a bank cannot confirm the credit of a non-bank issuer and thereby incur the obligations which the Code imposes on a confirming bank? Mercantile would have us apply a rule without examining the reason for that rule. But in order to justify applying a particular rule of law to a given set of circumstances, the application of that rule must advance the policy which gave birth to the rule in the first instance. This concept, whether followed implicitly or explicitly, is fundamental to our system of jurisprudence, as well as, to a proper application of the Uniform Commercial Code.

We have endeavored to determine if indeed there is a good reason for us to hold that a bank cannot confirm the credit of a non-bank issuer. This inquiry was necessary because we recognize that the drafters of the U.C.C. did not choose their words lightly, and a court should not be quick to conclude that an apparent rule of the Code is either unwise or inapplicable. Our search for a sound policy reason to apply the definition of a confirming bank literally and to exclude from Code-governance anyone who does not fit neatly within it has been in vain however. There is no reason to conclude that a bank should be unable to confirm the credit of a non-bank issuer under the U.C.C.

Our conclusion that there are no policy reasons to refrain from applying § 5–107(2) to a bank which confirms a non-bank credit does not end our inquiry; for unless the underlying purposes and policies of the U.C.C. will be affirmatively advanced by such a holding, we would refrain from it simply because the literal language of the Code seems to preclude it.

The question whether the rule that a bank may confirm a non-bank credit should be adopted initially requires an examination of § 1–102(2), which outlines the purposes of the Code as follows:

(2) Underlying purpose and policies of this Act are

(a) to simplify, clarify and modernize the law governing commercial transactions;

(b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;

(c) to make uniform the law among the various jurisdictions.

Mercantile argues that it is not customary practice for a bank to confirm a non-bank credit and, therefore, the Code was not intended to cover such a situation. One of the purposes of the U.C.C., however, is "to permit the continued expansion of commercial practices through custom, usage and agreement of the parties." Section 1–102(2)(b). Assuming that the manner in which the instant transaction was conducted is an expansion of customary banking and commercial practices, then the purpose of the U.C.C. is to accommodate this expanson if the parties have molded their activities so as to come within the scope of the Code. As we have previously observed, the letter of credit from Allied

should be true of a confirming bank. While this analogy does indeed have some force, we are not persuaded by it for the

same reasons that we are not persuaded that a bank may not confirm the credit of a non-bank issuer.

to Barclays fits the Code definition of a letter of credit and is within the scope of coverage of Article 5. As a threshold conclusion it would appear that the parties intended to be governed by the Code. It would be anomalous to decide that the legal relationships arising from the underlying credit are controlled by the Code, but that the purported confirmation of that credit and the obligations flowing therefrom are not derived from the same basic set of rules. Such a conclusion would not "simplify, clarify and modernize the law governing commercial transactions." Section 1–102(2)(a). The parties could have agreed that the obligations stemming from Mercantile's confirmation were not to be defined by the Code but were to be determined from some other source. Section 1–102(3). Other than the self-serving statements of Mercantile's Executive Vice President, Mr. Harris, concerning his own subjective view of the legal effect of the confirmation, however, there is nothing to indicate that the parties contemplated acting outside the framework of the Code. None of the documents or letters involved in this transaction read as indicating a desire to remove it from the scope of the Code. We have concluded that the broad purposes of the U.C.C. as expressed in § 1–102(2) will be furthered by applying Code evolved rules to the whole of the instant transaction.

Having determined that the general purposes of the U.C.C. will be advanced by applying the Code to this case, we turn to the more precise question of whether the policies underlying Article 5 would be furthered by applying a rule which is not specifically articulated there, but which is nonetheless developed by analogy to specifically codified rules. Section 5–102(3) is the ready and definite answer to this question. This section reads:

> (3) This Article deals with some but not all of the rules and concepts of letters of credit as such rules or concepts have developed prior to this Act or may hereafter develop. The fact that this Article states a rule does not by itself require, imply or negate application of the same or a converse rule to a situation not provided for or to a person not specified by this Article.

Even considering the admonition in § 1–102(1) that the Code should be liberally construed in light of its general purposes and policies, the above-quoted section is somewhat unique in that it expressly contemplates court-managed expansion of the principles contained in Article 5. The drafters recognized that, although letters of credit have been used for a number of years,[8] their use was "primarily as a financial adjunct to a contract for the sale of goods."[9] The drafters believed that as innovative businessmen became more familiar with the credit device its use—particularly in domestic business circles—would in all likelihood increase.[10] The rules codified

---

8. *See* Comment to Section 5–101. *See generally* Comment, Commercial Letters of Credit: Development and Expanded Use in Modern Commercial Transactions, 4 Cumberland-Samford L.Rev. 134, 135–37 (1973) [hereinafter cited as Comment].

9. Harfield, Code, Customs and Conscience in Letter-of-Credit Law, 4 Uniform Commercial Code L.J. 7, 9 (1971). The body of law dealing with letters of credit evolved primarily from the sale of goods in international trade. Today, the letter of credit is the single, most important financing tool used in the international sale of goods. W. Hawkland, A Transactional Guide to the Uniform Commercial Code, 791 (1964).

10. *See* H. Harfield, The Increasing Domestic Use of the Letter of Credit, 4 Uniform Commercial Code L.J. 251 (1972) ; S. Mentschikoff, Letters of Credit: The Need for Uniform Legislation, 23 U.Chi.L. Rev. 571 (1956) ; Comment, Recent Extensions in the Use of Commercial Letters of Credit, 66 Yale L.J. 902 (1957). *See generally* Comment, *supra*, note 8, at 148–54. Mr. Harfield stated, in the above cited article that:

> "The sponsors of the Uniform Commercial Code emphasized the importance of domestic use of letters of credit at the very outset of the Code project. More than twenty years ago they made the point that Article 5 was an essential

in Article 5 are only the foundation from which courts must develop, by analogy, new concepts to meet novel and diverse uses of the letter of credit.

We have just this type of situation, a new and different use of a letter of credit, before us in the instant case. Rather than using some other financing tool the parties involved in the real estate venture here chose the letter of credit as a device for securing $350,000 in working capital for Bay Holding Company. Reasoning by analogy,[11] we believe that if a bank becomes directly liable under § 5–107(2) by confirming a credit issued by another bank, then a bank which confirms a non-bank credit is also directly liable on that credit under the same section. We reach this conclusion notwithstanding that the op-

erative facts here do not seem to fit within the literal definition of a confirming bank in § 5–103(1)(f). Mercantile has offered no other reason which militates against this conclusion. Moreover, no other provisions of Article 5 cast doubt on the propriety of holding that a bank may confirm a non-bank credit under the Uniform Commercial Code. This conclusion affords a liberal construction to the Code, and it will facilitate the continued and expanding use of the letter of credit as a financing tool in the hands of the business planner. Finally, it is expressly ordained by § 5–102(3) because "[t]he fact that this Article states a rule does not by itself require, imply or negate the application of the same . . . rule to a situation not provided for or to a person not specified by this Article."[12]

11. *See* Comment 2 to Section 5–102, a portion of which reads as follows:

> "[T]he second sentence of subsection (3) makes explicit the court's power to apply a particular rule by analogy to cases not within its terms, or to refrain from doing so. Under Section 1–102(1) such application is to follow the canon of liberal interpretation to promote underlying purposes and policies. Since the law of letters of credit is still developing, conscious use of that canon and attention to fundamental theory by the court are peculiarly appropriate."

part of the Code, not because state law was required to govern an international instrument, and not because bankers, importers, and exporters required instruction in the use of the instrument, but because the Code would stimulate the domestic use of the letter of credit and, like other potent fertilizers, bring it to instant luxuriance and fruition."

The following recent decisions illustrate that the letter of credit is being used in business transactions other than the sale of goods. Fidelity Bank v. Lutheran Mut. Ins. Co., 465 F.2d 211 (10th Cir., 1972) (letter of credit used to assure compliance by borrower with one of conditions of loan commitment; Victory Carriers, Inc. v. United States, 467 F.2d 1334 (Ct. Cl., 1972) (letter of credit used in lieu of performance bond) ; Wichita Eagle & Beacon Pub. Co. v. Pacific Nat'l Bank, 343 F.Supp. 332 (N.D.Cal., 1971) (payments under a lease guaranteed by a letter of credit) ; Fair Pavilions, Inc. v. First Nat'l City Bank, 19 N.Y.2d 512, 281 N.Y.S.2d 23, 227 N.E.2d 839 (1967) (payments due under a construction contract secured by a letter of credit). Judge Levin, in the *Wichita Eagle* case, made the following poignant observation which is particularly relevant to our case:

> "Contrary to the Bank's implication, the letter of credit has long been a flexible device utilized by the commercial community to meet its needs in a wide variety of situations." 343 F.Supp. at 338.

12. One commentator has noted that:

> "The draftsman of Article 5 set out to codify the legal framework of letters of credit without attempting so comprehensive a treatment as to hinder the development of new practices and uses or to impede the flexibility of the letter of credit. . . . The draftsman apparently felt, and rightly so, that to attempt to include detailed treatment of such practices would stymie the development of new practices and the further streamlining of letter-of-credit transactions. The result, produced through many cycles of drafting, criticism, and redrafting, is a relatively clear, general statutory statement of the nature of letters of credit and of the rights and obligations of the parties. Article 5 makes no attempt to restrict, redirect, or revolutionize letter of credit law and practice; rather, the article organizes and sets out existing law in a clear and concise manner."

Comment, *supra*, note 8, at 161.

### III.

Even though we have concluded that under the U.C.C. a bank may confirm a non-bank credit, we must still determine whether Mercantile's letter of June 1, 1970, was, in fact, a confirmation of the credit issued to Barclays by Allied. The thrust of Mercantile's argument is that the question of the intent of the parties concerning this letter should have been submitted to the jury. We agree with the district court that there is not present in this case any dispute for a jury to resolve.

The pertinent provisions of the June 1 letter are as follows:

"We [Mercantile] hereby confirm the letter of credit and undertake to honor any drafts presented to us on or before expiration date of the letter of credit in accordance with the terms and conditions of said letter of credit."

The letter was signed by Carl M. Harris, the Executive Vice President of Mercantile, who handled this transaction. It appears from his deposition that he did not consult anyone at the bank regarding the language used in the letter or the legal effect of that language.[13] Even though there is a dispute surrounding the manner in which the language was added—Barclays said that its representative, Mr. Swart, quoted the language to Mr. Harris over the telephone while Mr. Harris stated that the language is that given to him by Mr. Vano, a representative of Allied, who had apparently received the language from Mr. Swart—there is no dispute concerning the words used, and it is undisputed that the source of the language was Barclays Bank. Mercantile argues that it only intended to confirm the signatures on Allied's letter of credit, that it was only obligating itself as a "collecting bank" (whatever that means in this context), and that it did not agree to pay Barclays from its own funds. According to Mercantile, there is thus a disputed factual issue, the intent of the

13. "Q. [By Barclays counsel] Excuse me. Do you recall when you prepared the document addressed to Barclays Bank dated June 1st, 1970, 3-paragraph letter? A. [Mr. Harris] It was in the morning of that day.

Q. In the morning of June 1st? A. Yes, sir. [18] Q. How did you happen to prepare this document? A. The letter is essentially the same as our first with the addition of a third paragraph. That wording was given to us by Mr. Vano and Mr. Wayman who came in to discuss it with me that morning.

Q. Mr. Raymond did you say? A. Wayman, Paul Wayman was their attorney at the time.

Q. Paul Wayman was Allied's attorney? A. Yes, sir.

Q. And they came into the bank here in Atlanta— A. Yes.

Q. —and met with you the morning of June the 1st, 1970? A. Yes.

Q. And what did they say to you? A. They said that they had decided to change their letter of credit to conform to what Barclays wanted and they needed a new letter from Mercantile National Bank and they said that they would have to add the little paragraph there, the third paragraph, and they gave me the wording to be used.

Q. Did you ask them anything about the third paragraph as to why it was needed? [19] A. Yes, they indicated it was so that we could act as a collecting bank when it came time for the draft to be sent in.

Q. Who was doing the talking, the lawyer or Mr. Vano? A. Mainly Mr. Vano.

Q. Can you recall as specifically as you can at this late date precisely what was said by Mr. Vano at that time concerning the third paragraph of the new letter? A. I can't recall the exact conversation.

Q. Can you give me the substance of it as close as you can, word for word, ·but if you can't give it word for word, just get as close as you can to that? A. The substance was that the third paragraph was to be added and they had a slip of paper with the wording on it to enable Barclays to use us as the collecting bank.

parties, on which it should have been allowed to present extrinsic evidence supporting its view to a jury.

■ We agree with Mercantile that as a general rule interpretation of a written agreement is a question of fact. *See* Dobson v. Masonite Corp., 359 F.2d 921, 923 (5th Cir., 1966); Zell Ins. Agcy., Inc. v. Guaranty Security Ins. Co., 399 F.2d 149 (5th Cir., 1968); 3 Corbin, Contracts, § 554 at 219 (1960). Agreement on this point, however, does not compel the conclusion that a jury question is always created when parties supposedly differ regarding the meaning of terms used in a writing. Professor Corbin follows his statement of the rule with the following analysis:

"The question of interpretation of language and conduct—the question of what is the meaning that should be given by a court to the words of a contract, is a question of fact, not a question of law. . . . There is no 'legal' meaning, separate and distinct from some person's meaning in fact.

"We must bear in mind, however, that this question of fact is like other questions of fact in this: it may be a question that should be answered by the judge rather than by the jury. In cases in which it is so answered, it is probable that the interpreting judge may say that interpretation of language is a 'question of law for the court.' . . .

"Whether we describe this matter as a question of fact or a question of law, it is necessary to find some test for determining whether it is for the judge to determine rather than for the jury. As in the case of all other matters of fact, we can here lay down the rule that if the evidence is so clear that no reasonable man would determine the issue before the court in any way but one, the court will itself determine the issue, either by directing the verdict or by dispensing with any verdict whatever. By this statement, however, we do not say that if no reasonable man would have used the words with any but one meaning, that meaning will be adopted by the court without aid from the jury. The person whose meaning is in issue may have been a very unreasonable man; such men make contracts. The court must indeed state the issue; it must determine the person or persons whose meaning shall be held to prevail. What that meaning was, though a question of fact, may be made so clear by the evidence that a jury's verdict to the contrary would be set aside.

". . . If the words of agreement, whether oral or written, are definite and undisputed, and if there is no doubt as to the relevant surrounding circumstances, the interpretation of the words is ordinarily held to be a matter for the court. Even if these circumstances are in dispute, the evidence as to what they were may be so clear and convincing that the court would set aside a verdict contrary to that evidence. The result of these rules is that in very many cases where the contract is in writing the interpretation of its language has been held to be for the court and not for the jury." *Id.* at 219–25.

■ In determining whether to permit the introduction of extrinsic evidence of the parties' intent relative to meaning to the jury, the court must first determine that reasonable differing inferences as to meaning are raised by the words used in the context and cir-

Q. Did they tell you where they had gotten the wording or why that was necessary? A. No, sir, they didn't that I recall.

Q. Did you discuss this with anyone else besides Mr. Vano and the lawyer before you wrote the June 1st, 1970 letter? A. No, sir."

cumstances of their use. The issue here then is whether the meaning attached to the third paragraph of Mercantile's letter by Barclays—that Mercantile confirmed Allied's letter of credit—is subject to a factual dispute entitled to be submitted to the jury.

In the circumstances of this case there was no dispute for the jury to resolve. One important factor is simply Mercantile's participation in this transaction. Barclays is entitled to assume that when dealing with another bank in a commercial undertaking that bank is competent to conduct its own affairs. Mr. Harris's deposition reveals that he did not completely understand what he was doing when he added the confirmatory language.[14] But there are no allegations that Barclays deceived Mr. Harris or tricked him into adding the third paragraph of the letter. Mr. Harris's lack of understanding and failure of knowledge in this area of banking business cannot furnish an out for his employer, Mercantile. Barclays was entitled to rely on the statement in the letter which would justify a reasonable banker in concluding that Mercantile confirmed Allied's letter of credit. The language used conforms to that commonly employed in banking circles to confirm a letter of credit.[15] Having employed words which give of but one meaning in the community of their use, Mercantile cannot escape the legal liability flowing from the use of those words by the assertion that it did not use them as they are commonly understood in banking circles.

In determining whether to allow extrinsic or parol evidence regarding the meaning of the June 1, 1970 letter to go to a jury, the district court was bound to apply the parol evidence rule, a rule of the substantive law of contract, as would a Georgia court. Harville Rose Service v. Kellogg Co., 448 F.2d 1346, 1349 (5th Cir., 1971). Applying the standard for the admissibility of parol evidence as formulated by the Georgia courts,[16] we hold that the district court properly granted Barclays' motion for summary judgment.

### IV.

Mercantile advances three additional theories on which to escape liability: (1) that Mercantile's obligation was a guaranty and as such is ultra vires for a national bank; (2) that Barclays failed to provide the necessary documentation accompanying its draft to Mercantile; and (3) that Barclays had a duty on the day Allied allegedly repudiated its letter

---

14. "Q. —in the banking trade, Do you know what a confirmation of a letter of credit is? A. Confirmation of a letter of credit to me would mean the verifying of the authenticity of it and as far as signatures and so forth.

Q. Where did you learn that? A. Just through bank experience.

Q. You have never had an experience in your banking career that would lead you to believe that a confirmation of a letter of credit makes the confirming bank directly obligated on the letter of credit just as the issuer would be? A. No, sir.

Q. And how many letters of credit have you confirmed in your capacity with these banks that you have named throughout your experience? A. Two.

Q. And they were both in June of 1970? A. Yes, sir."

15. See, e. g., W. Ward and H. Harfield, Bank Credits and Acceptances, at 132–33 (4th Ed., 1958); Uniform Customs and Practice for Documentary Credits, Fixed by the Thirteenth Congress of the International Chamber of Commerce (1962 Revision). Allied's letter of credit was issued subject to this compilation. The Uniform Customs and Practice is the standard reference for banks dealing with letters of credit.

16. See Farm Supply Co. v. Cook, 116 Ga. App. 814, 159 S.E.2d 128 (1967); Cotton States Mutual Ins. Co. v. Booth, 116 Ga.App. 410, 157 S.E.2d 877 (1967); S & S Builders, Inc. v. Equitable Investment Corp., 219 Ga. 557, 134 S.E.2d 777 (1964).

of credit to withhold payment to Bay Holding of additional funds under the credit. We reject these contentions.

■ Mercantile's relationship to this transaction has been established as that of a confirming bank. "A confirming bank by confirming a credit *becomes directly obligated* on the credit to the extent of its confirmation as though it were its issuer and acquires the rights of an issuer." Section 5–107(2) (emphasis added). "It may seem that a letter of credit is in the nature of a guaranty. In fact, there is a vast difference between a guaranty and a letter of credit. The issuer of a credit assumes a primary obligation to the beneficiary as opposed to a secondary liability under a guaranty." [17] It is clear that Mercantile's obligation here is not a guaranty.[18]

Mercantile next argues that it has no duty to pay the draft presented by Barclays because the draft was not accompanied by the proper documentation. The crucial, undisputed fact in this regard is that following the receipt of Barclays' draft Mercantile wrote a letter to Barclays on June 9, 1971, which, although stating that the draft was being dishonored, acknowledged that the draft was accompanied "with all required documentation called for in the said Letter of Credit." Mercantile now endeavors to escape liability by confessing that it made a mistake in the letter because hindsight reveals that Barclays did not furnish the proper documentation.

■ As did the district court, we will assume that the documentation furnished by Barclays was faulty. We nonetheless agree with the district court that it is too late in the journey to raise this defect. Since Allied's letter of credit did not expire until June 15, 1971, if Mercantile had notified Barclays on June 9, 1971, that the documentation furnished was improper, Barclays might have remedied the defect. To allow Mercantile to raise this defense, founded upon its own admitted mistake and after affirmatively stating that all required documentation was present, would not comport with our abstract sense of justice, nor, and more importantly, with the rule applied in cases involving letters of credit that "[b]y formally placing its refusal to pay on one ground, the defendant must be held to have waived all others." Bank of Taiwan v. Union National Bank, 1 F.2d 65, 66 (3rd Cir., 1924). *See also* Continental National Bank v. National City Bank, 69 F.2d 312, 318–319 (9th Cir., 1934).

Mercantile points out that this rule has not heretofore been applied by this circuit nor by the courts of Georgia. The more significant fact, however, is that it has not been rejected. Under Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), we are therefore free to apply this rule because we believe that it would be applied by the Georgia Supreme Court.

It is apparent from Mercantile's June 9 letter that its refusal to pay the draft was not premised on the absence of the

---

17. J. Halls, The Uniform Commercial Code in Minnesota: Article 5—Letters of Credit, 50 Minn.L.Rev. 453, 454 at n. 3 (1966).

18. *See* Border National Bank v. American National Bank, 282 F. 73, 77 (5th Cir., 1922), cert. den. 260 U.S. 701, 43 S.Ct. 96, 67 L.Ed. 471. As one commentator has noted:
 "A letter of credit always serves as a guaranty. This does not mean that it is a guaranty. A letter of credit is an identical twin to a guaranty, but the fact that the two things look alike and may be used for the same purpose and are difficult to distinguish one from the other, does not mean that they are the same thing, and does not mean that there are not differences, which, however subtle, are of major importance."
 H. Harfield, Uniform Commercial Code: Symposium—Code Treatment of Letters of Credit, 48 Corn.L.Q. 92, 93 (1963).

proper documents.[19] The letter states affirmatively that the documentation was satisfactory. Payment was refused because Mercantile did not believe that it was liable to pay the draft from its own funds. In addition, Mercantile's appellate brief reveals that Mr. Harris did not even examine the documents to determine if, in fact, they did conform. According to the brief, he simply took Barclays' word that all required documentation accompanied the draft. Mercantile again seems to be of the view that Barclays should bear the brunt of Mr. Harris's failure to ascertain what was going on, that, for some unexplainable reason, Barclays is to blame for Mercantile's failure to adequately perform its banking duties. Mercantile cannot lull Barclays into believing that there was no problem with the documentation when there was still time for Barclays to have attempted to cure the technical defect and then turn around and assert the lack thereof as a defense to the suit on the draft. Having informed Barclays that the documentation was proper, Mercantile must, on the facts of this case, be held to have waived the alleged faulty documentation as a defense.

There are no provisions in Article 5 which would indicate a belief on the part of the drafters that this doctrine of waiver should be inapplicable under the U.C.C. Absent a disavowal of the rule, a section providing to the contrary, or a section which conflicts with the purpose of this rule, § 5–102(3) provides an adequate source for the conclusion that this rule of waiver may be applied in appropriate cases. "Subsection (3) [§ 5–102(3)] recognizes that in the present state of the law and variety of practices as to letters of credit, no statute can effectively or wisely codify all the possible law of letters of credit without stultifying further development of this useful device." Section 5–102(3), Comment 2. Our decision that the rule should be applied to Mercantile is in accord with a court's duty to construe Article 5, as well as the other·rules relating to letters of credit not codified in this Article, in such a manner as to conform the rules to an underlying sense of fair play so that the expectations of the parties to a business transaction will not be frustrated by the application of a rule which is not grounded in sound policy considerations.

As a last ditch effort to escape complete liability for the amount of the draft, Mercantile argues that Allied repudiated its letter of credit when on Au-

---

19. Mercantile National Bank
 70 Broad Street, N.W.
 Atlanta, Georgia 30303
 June 9, 1971

Barclays Bank D.C.O.
Local Head Office
PAN AM Building
200 Park Avenue
New York, New York 10017

 Re: Irrevocable letter of credit of Allied Mortgage Consultants, Inc. dated June 1, 1971 not exceeding $400,000 for account of Bay Holding Company Ltd. in favor of Barclays Bank D.C.O.

Gentlemen:

 We received on June 8, 1971 your draft in the sum of Two hundred eighty thousand, eleven dollars and sixty five cents ($280,011.65) upon Allied Mortgage Consultants, Incorporated under the latter's Irrevocable Letter of Credit dated June 1, 1970 with all required Documentation called for in the said Letter of Credit.

 Pursuant to our letter of June 1, 1970 to you, we undertook to have the draft paid by Allied Mortgage Consultants, Incorporated, a copy of which is attached hereto.

 I regret to advise you that Allied Mortgage Consultants, Incorporated has not honored the draft as of 9:30 a. m., June 9, 1971, the time we were advised by the Messrs. Swarts that they would call for payment of said draft. As a consequence, we are returning herewith your draft in the amount of two hundred eighty thousand eleven dollars, and sixty-five cents ($280,011.65) and all documents delivered on June 8, 1971.

 Yours very truly
 /s/ Carl M. Harris
 Executive Vice President
CMH/ch
Enc:

gust 4, 1970, approximately two months after the credit was issued, Allied wrote Barclays instructing that "no further funds are to be drawn against the letter of credit without the written authorization from Allied Mortgage Consultants." Reasoning from the premise that Allied's letter was a repudiation of its credit, Mercantile concludes that Barclays had a duty to call Bay's promissory note and to apply Bay's funds then on deposit against the debt. If this action had been taken, Barclays would have been out-of-pocket $95,041.10; Mercantile reasons that if it is liable at all, it is only for this amount.

■■■■ The problem with Mercantile's argument is the assumption that Allied's letter was a repudiation of its credit. Allied's letter to Mr. Curt Meltzer of Bay Holding, which accompanied the alleged repudiation, evidences an intent on the part of Allied to continue with the transaction if Bay Holding complied with Allied's request regarding their underlying agreement.[20] Allied's letter does not represent a clear determi-

nation not to perform under its credit. At most, Allied's letter was an attempt to modify its irrevocable letter of credit. But, "once [an irrevocable letter of credit] is established as regards the [beneficiary] it can be modified or revoked only with [his] consent." Section 5–106(2). *See* Asociacion de Azucareros de Guatemala v. United States National Bank, 423 F.2d 638 (9th Cir., 1970); Dulien Steel Products, Inc. v. Bankers Trust Co., 189 F.Supp. 922 (S.D.N.Y., 1960). Barclays did not consent to this proposed modification. In addition, Allied could not modify the irrevocable credit without Bay Holding's consent because "[u]nless otherwise agreed once an irrevocable credit is established as regards the customer it can be modified or revoked only with the consent of the customer." Section 5–106(2). Allied's letter was only an ineffectual request to modify the terms of its irrevocable credit.

■■■■ Mercantile fails to appreciate that Allied's relationship with Barclays, as well as its own relationship with Bar-

---

20. Allied International Mortgage Group
75 Lee High Road
Lewisham,
London, S.E. 13
Telephone 01–852–9344
Telex 896291

Head Office: Atlanta Georgia, U.S.A.
August 4th, 1970
Mr. M. Curt Meltzer
7 East 48th Street
New York 10017
U.S.A.
Dear Sir,
re Bay Holding Company Inc.

We are extremely surprised at your lack of courtesy regarding our previous telex and telephone messages which have been left at your offices, and to which, as at today, we have received no reply from you.

We wish to confirm to you, that we have spoken to Mr. Schwartz of Barclays Bank D.C.O. and have informed them that Allied Mortgage Consultants of Atlanta, Georgia have not yet received the required documents in accordance with the terms and conditions as laid down in the agreement between Bay

Holding Limited, and Allied Mortgage Consultants on the 26th May, 1970.

In view of the extended time which has now expired, we have given instructions that no further money may be withdrawn against the letter of credit, and we require you to deliver to Allied Mortgage Consultants within four days from the date of this letter, the said documents to the Attorneys of Allied Mortgage Consultants, failure of which will involve calling on you, under your personal guarantee to reimburse such funds, together with interest thereon to Barclays Bank D.C.O. which have been drawn against the letter of credit issued by Allied Mortgage Consultants on the clear understanding and provision of your delivering to them the relative legal documents in respect of the Goodwood Estate in Trinidad W.I.

We trust however that you will not make this action necessary and that you will conform with the conditions, and conduct this matter in a business like manner.
Yours faithfully
for and on behalf of
Allied International Mortgage Group
D. E. Dawkins

clays, is independent of the underlying contract between the customer and the beneficiary. *See* §§ 5–109; 5–107, Comment 2; 5–114, Comment 1. *See also* Sisalcords do Brazil, Ltd. v. Fiacao Brasileira de Sisal, S.A., 450 F.2d 419 (5th Cir., 1971).[21] The independent nature of the relationships between these parties—Bay Holding, Allied, Mercantile and Barclays—makes it apparent that Allied's letter did not supply the basis upon which Barclays could alter its relationship with Bay Holding. Mercantile is thus liable for the entire amount of the draft presented to it by Barclays.

### V.

We have gone to some length in this opinion to explain our reasons for upholding the district court's judgment. Perhaps we have said more than was absolutely necessary. But the paucity of court decisions dealing with letters of credit generally, and with the primary issue raised by our case in particular, compelled us to consider in some detail the policy considerations for holding as we have.

The purpose served by ruling that this transaction is within the Code is that commercial undertakings are facilitated if businessmen (and perhaps also their lawyers) can be reasonably certain of the set of rules which will govern their activity. As a particular transaction is

planned, there are, of course, many considerations other than the legal aspects of a specific course of action. But a businessman would be derelict in his planning if he did not ask the question: What rules will apply if this transaction goes sour or fails to meet expectations? The instant case is an example of both adequate and inadequate planning. Instead of merely relying on the promissory note of Bay Holding and the security accompanying it, Barclays sought a letter of credit from a party who was apparently in better financial condition and more easily accessible than Bay Holding. The relationship with Allied was thus born. Allied was willing to issue its letter of credit because of its expectation of receiving a monetary reward from Bay for aiding Bay in obtaining the money from Barclays. It is most significant that the device chosen by Barclays and Allied to be the basis of their relationship was the letter of credit which results in the creation of a relationship independent of the underlying transaction between the issuer of the credit and its customer, or between the customer and the beneficiary of the credit.

Mercantile came into the picture because Barclays was not completely satisfied with its relationship with Allied and because Allied sought help from its banker in carrying the commercial undertaking through to completion.[22] The

21. One commentator has described the typical letter of credit transaction in the following manner: "Three contracts are involved in most letter-of-credit transactions: 1) the contract between the issuer and the account party for the issuance of the credit; 2) the letter of credit itself, a contract between the issuer and the beneficiary; and 3) the underlying agreement, often a contract of sale, between the beneficiary and the account party. The letter of credit is completely independent from the other two contracts." Comment, *supra*, n. 8 at 142 n. 39.

22. Mercantile urged in its brief that it could not be liable in this case because it did not receive any consideration from Allied to support its writing of the con-

firmatory letter. This contention is frivolous in view of § 5–105 which provides that "no consideration is necessary to establish a credit or to enlarge or otherwise modify its terms." The reason for this rule is explained by the comment to § 5–105 as follows:

"It is not to be expected that a financial institution will engage its credit without some form of expected remuneration. But it is not expected that the beneficiary will know what the issuer's remuneration was, or whether in fact there was any identifiable remuneration in a given case. And it would be extraordinarily difficult for the beneficiary to *prove* the issuer's remuneration. This section dispenses with such proof."

tool used to involve Mercantile was a letter confirming Allied's credit. The pains taken by Barclays to assure that Mercantile's letter met the common requirements of a letter of confirmation is unmistakably indicative of a purpose to create an independent relationship with Mercantile Bank. In short, Barclays was planning for the contingency which did in fact occur. Mercantile has not presented, and we are unable to discern, any reason to frustrate this planning.

The judgment of the district court is affirmed.