**BANCO di ROMA, Plaintiff,**

v.

**FIDELITY UNION TRUST COMPANY, Defendant.**

**Civ. A. No. 76–1820.**

United States District Court, D. New Jersey.

Feb. 8, 1979.

Migdal, Tenney, Glass & Pollack, New York City, for plaintiff; Lawrence W. Pollack, New York City, of counsel.

Riker, Danzig, Scherer & Debevoise, Newark, N. J., for defendant; Gerald A. Liloia, of counsel; James S. Rothschild, Jr., and Michael L. Prigoff, Newark, N. J., on the brief.

## OPINION

COOLAHAN, Senior District Judge.

This is an action by a bank, which issued an irrevocable letter of credit, against an advising bank. The parties have made cross-motions for summary judgment. Because we have determined that there is a genuine issue of material fact, these motions must be denied.

Plaintiff, Banco di Roma, seeks to recover $298,816.15 from defendant Fidelity Union Trust Company ("Fidelity") for Fidelity's improper payment of a letter of credit issued by Banco di Roma. The bulk of the pertinent facts in this case are contained in telexes sent back and forth between the parties.

## BACKGROUND

The transactions that underly this case began in March, 1975 when Consolidated Machinery Export Ltd. ("Consolidated"), whose office is in Newark, agreed to sell two tractors to United Tractor Co. ("United"), whose office is in Beirut, Lebanon. At the request of United, Banco di Roma's Beirut branch issued an irrevocable letter of credit in favor of Consolidated. Defendant Fidelity, a New Jersey bank, agreed to advise and pay the credit on behalf of Banco di Roma.

On March 10, 1975, Banco di Roma telexed to Fidelity the fact of the opening of this letter of credit; the details of the credit to follow. The telex specified the destination of the tractors as "BEIRUT FREE ZONE IN TRANSIT KUWAIT." On March 13, 1975 [1] Banco di Roma telexed to

Fidelity the details of two letters of credit. The first credit (the "Foley credit"), which is not in issue in this case, was described in full. The cable then described the Consolidated credit as "SIMILAR TO" the Foley credit "EXCEPT . . . ." One of the terms of the Foley credit read as follows:

1) GOODS TO BE RENDERED FOB EAST PORT NEW YORK OR NEWARK *DESTINATION BEIRUT ZONE FRANCH IN TRANSIT KUWAIT* (emphasis added) (Zone Franch means Free Zone).

One of the "exceptions" to the Foley credit read:

2) GOODS TO BE RENDERED FOB NEWARK STOP

After receiving this March 13 telex Fidelity issued two formal letter of credit advices—the Foley credit and the Consolidated credit. The Foley credit contained the term designated as (1), *supra*. The Consolidated credit, however, omitted stating any destination. Apparently, Fidelity substituted phrase (2), *supra*, for phrase (1), *supra*, in its entirety, rather than just changing the FOB designation.

The Bill of Lading and Certificate of Origin (documents required to be presented under the letter of credit agreement) stated the destination as "Beirut" and not "Beirut Free Zone In Transit Kuwait." Although these two designations refer to the same port, no customs duties accrue in the Free Zone.

On April 18, 1975, Fidelity paid the letter of credit amount to Consolidated and forwarded the shipping documents to Banco di Roma. Also on April 18, Fidelity notified Chemical Bank that it had paid the Banco di Roma credit and requested Chemical to credit Fidelity's account against Banco di Roma's account. On April 22, 1975, Fidelity obtained $298,816.15 from Banco di Roma's account at Chemical Bank. It is this sum that Banco di Roma seeks to recover.

On May 7, 1975 Banco di Roma received the shipping documents from Fidelity. By

---

1. There appears to be some question whether this detailed telex was sent on March 11 or March 13. *Compare* Brief for Plaintiff at 3 *with* Brief for Defendant at 1. For our pur-

poses, the precise date of the telex is immaterial. We will assume, *arguendo*, that the telex was dated March 13.

telex dated May 9, 1975 Banco di Roma informed Fidelity that United had rejected the documents because of the incorrect destination term.[2] Banco di Roma requested Fidelity to recredit its account at Chemical Bank and stated that it was holding the shipping documents at Fidelity's "disposition" awaiting "instructions." [3]

During the next month Fidelity managed to get the tractors designated Free Zone.[4] This was done with some difficulty because Banco di Roma was in possession of the title documents and refused Fidelity's requests for assistance. Banco di Roma several times renewed its request for reimbursement from Fidelity,[5] reiterating that the documents were being held at Fidelity's "disposition" while Banco di Roma was awaiting "instructions."

Subsequently, attempts were made to resolve the matter by selling the tractors to a third party. Before such a sale was consummated, the tractors were destroyed during the civil disorder in Lebanon.

**2.** The rejection also noted that the goods had beèn shipped from New York and not Newark. Fidelity immediately explained that the goods had actually been shipped from Newark and that the New York designation referred to the entire Port Authority complex, which includes Newark.
 Plaintiff now relies solely upon the misstated destination as the basis for rejection.

**3.** This telex, *on its face*, satisfied Banco di Roma's duty to Fidelity upon rejection of the documents. *See* UCC § 5–112(2); UCP Article 8. As will be seen *infra*, the documents *in fact* were not held at Fidelity's "disposition."

**4.** The tractors were not physically moved. Whether or not something is in the Free Zone is a status designation.

**5.** *See, e. g.,* Banco di Roma telexes to Fidelity dated May 20, June 16, June 20, June 23, June 26.

**6.** There is some disagreement between the parties as to precisely which document constitutes the agreement between Fidelity and Banco di Roma. *See, e. g.,* Defendant's Reply Memorandum of Law at 2. Because there is no substantive difference between defendant's proffered document and plaintiff's document, it is unnecessary to decide which document constitutes the actual agreement. For simplicity, we will refer to the March 13, 1975 telex from Banco di

## DISCUSSION

By agreement of the parties, the letter of credit transaction *sub judice* was subject to the Uniform Customs and Practice for Commercial Documentary Credits (1962 Revision), International Chamber of Commerce Brochure No. 22 ("UCP"). *See* telex of March 13, 1975. By operation of law, the New Jersey Uniform Commercial Code ("UCC") also governs this transaction. *See* UCC §§ 5–102(1)(a), 1–105(1).

The starting point of our analysis is the fundamental principle of letter of credit law embodied in Article 8 of the UCP— "[i]n documentary credit operations all parties concerned deal in documents and not in goods." The underlying contract between United and Consolidated has no bearing on this case. *See, e. g., Chase Manhattan Bank v. Equibank*, 550 F.2d 882, 885 (3d Cir. 1977). The agreement between Banco di Roma and Fidelity, as defined by Banco di Roma's March 13, 1975 telex,[6] and the docu-

Roma to Fidelity as the operative document. The full text of this telex is as follows:
FURTHER OUR CABLE DATED 10 INSTANT WE COMMUNICATE YOU HEREWITH DETAILS OUR DOCREDIT 121026 AS FOLLOW ORDER ACCOUNT UNITED TRACTORS CO WE OPEN IRREVOCABLE DO CREDIT 121026 FAVOUR FOLEY MACHINERY CO 855 CENTINIAL AVE PISCATAWAY N J 08854 FOR ASUM OF USDOLLARS 150300 MAXIMUM AVAILABLE AT SIGHT AGAINST THE FOLLOWING DOCUMENTS AA COMMERCIAL INVOICE IN 3 FOLDS DULY AUTHENTICATED BY THE BENEFICIARY ASTO THE VALUE AND THE ORIGIN OF GOODS WHICH MUST BE EXCLUSIVELY AMERICAN OF WHICH 2 FOLDS MUST BE CERTIFIED BY THE CHAMBER OF COMMERCE AND LEGALIZED BY THE LEBANESE CONSULATE WITH SIGNATURE AND APPROVAL OF MR HAGOP KASPERIAN AND BEARING THE FOLLOWING CLAUSES PRIMO WE HEREBY CERTIFY THAT THE ABOVE INVOICE ISIN ALL RESPECTS TRUE AND CORRECT AND THAT THE VALUE SHOWN THEREON OF IS THE ACTUAL SELLING PRICE OF THE GOODS REFERRED TO ALSO THAT THIS HAS BEEN EFFECTIVELY COMPLETED IN AMERICA COUNTRY OF ORIGIN OFTHE GOODS SECUNDO WE COMMIT OURSELVES NOT TO LOAD THE GOODS OFTHE PRESENT INVOICE ON BOARD OF ISRAELI

ments presented thereunder are our sole concern. *See, e. g.,* UCC § 5–114 and Comment 1; *Courtaulds North America, Inc. v. North Carolina Nat'l Bank,* 528 F.2d 802, 805 (4th Cir. 1975); *Sisalcords Do Brazil Ltd. v. Fiacao Brasileira De Sisal S.A.,* 450 F.2d 419, 422 (5th Cir. 1971), *cert. denied,* 406 U.S. 919, 92 S.Ct. 1771, 32 L.Ed.2d 118 (1972).

Fidelity argues that Banco di Roma's instructions in the March 13 telex were ambiguous and asks the Court to construe the

SHIPS ORON SHIPS BLACKLISTED BY THE ISRAELI BOYCOTT OFFICE OR CALLING ON ISRAELIAN PORTS BB FULL SET CLEAN ON BOARD TO ORDER BLANK ENDORSED BILLS OF LADING MENTIONING FREIGHT PAYABLE AT DESTINATION NOTIFY ORDERERS BANCO DI ROMA BEIRUT AND THE NUMBER OF THE CREDIT AND SHOWING THAT SHIP DOES NOT SAIL UNDER AN ISRAEL FLAG AND WILL NOT CALL AT ANY ISRAELI PORT LOADING PORT EAST PORT NEWYORK OR NEWARK CC CERTIFICATE OF ORIGIN IN 3 FOLDS ISSUED BY THE CHAMBER OF COMMERCE AND LEGALISED BY LEBANESE CONSULAT CERTIFYING THAT THE ORIGIN OFTHE GOODS IS AMERICAN DD BOYCOTTAGE CERTIFICAT ALL COVERING NEW D8K TRACTOR SERIAL NO 77V2099 POWER SHIFT ELECTRIC STARTER EQUIPED WITH 8S BULDOZER EXTREME CUTTING EDGE AND END BITS AND 8D RIPPER SINGLE SHANK DEEP RIPPING 72″ HYDRAULIC FOUR BARREL WITH ONE EXTRA SHANK HEAVEY DUTY RADIATOR GUARD TRACK ROLLER GUARDS WITH 7 ROLLERS EACH SIDE ALTERNATOR 50 AMP CANOPY STEEL ROPS DECELETOR ENGINE ENCLOSURE FAN BLAST DEFLECTOR FAST FILL FULL SYSTEM CRANKCASE EXTREME SERVICE RADIATOR HINGED HEAVY DUTY HORN IDLERS EXTREME SERVICE FOUR LIGHTS FOR USE WITH ROPS MOUNTING METER ELECTRIC HOUR OIL CHANGE SYSTEM QUICK SERVICE RADIATOR CORE PROTECTOR GRIB SEAT SHOCK DAMPENING TOOL KIT GROUSER SHOES 22″ EXTREM SERVICE VANDALISM PROTECTION INSTRUMENT PANEL GUARD CAP LOCKS FOR FULL TANK HYDRAULIC TANK OIL FILTER AND RADIATOR FOR *GOODS TOBE RENDERED FOB EAST PORT NEWYORK OR NEWARK DESTINATION BEIRUT ZONE FRANCH IN TRANSIT KUWAIT* SHIPPING DATE NOT LATER THAN 10TH APRIL 1975 PART SHIPMENT PROHIBITED TRANSHIPMENT PROHIBITTED CREDIT VALID UNTIL 25th APRIL 1975 FOR PRESENTATION FOR PAYMENT WITH YOU PLEASE ADVISE BENEFICIARES WITHOUT ADDING YOUR CONFIRMATION IN REIMBURSEMENT OF YOUR PAYMENT INCLUDING YOUR CHARGES AND COMMISSIONS PLEASE DRAW ON CHEMICAL BANK NEWYORK INTERNATIONAL LETTER OF CREDIT DEPT UNDER ADVISE TOUS AND YOUR REIMBURSEMENT CLAIM TOBE ACCOMPANIED

BYA COMPLIANCE CERTIFICATE AND THAT ALL DOCUMENTS HAVE BEEN AIRMAILED TOUS DIRECTLY IN TWO SEPARATE SETS BY REGISTERED AIRMAIL DOCUMENTS TOBE REMITTED TOUS AS ABOVE THIS CREDIT SUBJECT TO UNIFORM CUSTOMS AND PRACTICE FOR DOCREDIT 1962 REVISION INTERNATIONAL CHAMCOMERCE STOP FURTHER OUR CABLE DATED 10TH INSTANT WE COMMUNICATE YOU HEREAFTER DETAILS OUR DOCREDIT 121027 SIMILAR TO DOCREDIT 121026 EXCEPT FOR AA CREDIT FAVOUR CONSOLIDATED MACHINERY EXPORT LTD THROUGHMIDLANTIC NATIONAL BANK 744 BROAD ST NEWARK N Y 07101 BB AMOUNT USDOLLARS MAXIMUM 298500 CC LOADING PORT NEWARK DD CERTIFICATE OF ORIGIN IN 3 FOLDS ISSUED BY THE CHAMBER OF COMMERCE CERTIFYING THAT THE ORIGIN OF THE GOODS IS AMERICAN EE COVERING FIRST ONE NEW D8K SERIAL NO 77v2031 PRICE USDOLLARS 151000 SECOND ONE NEW D8K SERIAL NO 77v2213 PRICE US DOLLARS 147500 POWER SHIFT ELECTRIC STARTER EQUIPED WITH 8S BULDOZER EXTREME CUTTING EDGE AND END BITS AND 8D RIPPER SINGLE SHANK DEEP RIPPING 72″ HYDRAULIC FOUR BARREL WITH ONE EXTRA SHANK HEAVEY DUTY RADIATOR GUARD TRACK ROLLER GUARDS WITH 7 ROLLERS EACH SIDE ALTERNATOR 50 AMP CANOPY STEEL ROPS DECELETOR ENGINE ENCLOSURE FAN BLAST DEFLECTOR FAST FILL FULL SYSTEM CRANKCASE EXTREME SERVICE RADIATOR HINGED HEAVY DUTY HORN IDLERS EXTREM SERVICE FOUR LIGHTS FOR USE WITH ROPS MOUNTING METER ELECTRIC HOUR OIL CHANGE SYSTEM QUICK SERVICE RADIATOR CORE PROTECTOR GRIB SEAT SHOCK DAMPENING TOOL KIT GROUSER SHOES 22″ EXTREM SERVICE VANDALISM PROTECTOR INSTRUMENT PANEL GUARD CAP LOCKS FOR FULL TANK HYDRAULIC TANK OIL FILTER AND RADIATOR FF *FOR GOODS TOBE RENDERED FOB NEWARK STOP* ADVISE BENEFICIARIES AVOIDING DUPLICATION STOP CONCERNING DOCREDIT 121026 AS USDOLLARS 15000 HAS BEEN ALREADY PAID IN ADVANCE BY ORDERERS TO BENEFICIARES DIRECTLY THE AMOUNT TOBE PAID UNDER THIS CREDIT TOBE USDOLLARS 135300 ONLY

BANCROMA

(emphasis added)

ambiguity against Banco di Roma. *See, e. g., Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461, 466 (2d Cir. 1970). The simple fact is, however, that Banco di Roma's instructions were not ambiguous. First, we find the form chosen by Banco di Roma for defining the terms of the Consolidated credit—by reference to the Foley credit followed by exceptions—to be reasonable.[7] Second, it is clear that Fidelity erred when it substituted the Consolidated exception "Goods to be rendered FOB Newark" for the *entire* phrase "Goods to be rendered FOB east port New York or Newark Destination Beirut Zone Franch in transit Kuwait," rather than changing only the FOB designation. That an FOB designation and the ultimate destination of goods under a contract of sale are distinct concepts is obvious. The plain import of Banco di Roma's instruction was that the phrase "Goods to be rendered FOB Newark" should have been substituted for the phrase "Goods to be rendered FOB east port New York or Newark," with the destination left unchanged. Because the Foley credit stated the destination as "Beirut Zone Franch in transit Kuwait" and no destination term appeared in the exceptions, the Consolidated credit should also have contained this destination term.[8]

As a consequence of Fidelity's error, the Bill of Lading and Certificate of Origin did not contain the correct destination term.[9] Because of the incorrect destination term, the goods were delivered to the regular port at Beirut and unnecessary customs duties accrued. Thus, contrary to defendant's assertion in its brief, Fidelity's error was not a mere technical error that Banco di Roma could not rely upon in rejecting the documents. Since the documents submitted under the Consolidated letter of credit were not in conformity with the March 13 telex, they were properly rejected.[10] *Cf.* UCC § 5–107(3); Article 7 UCP.

Fidelity's third defense is that the incorrect destination was ratified by Banco di Roma. By its terms, the Consolidated credit required a Mr. Hagop Kasparian to approve the commercial invoice. Kasparian approved an invoice which stated the destination of the tractors as Lebanon, without designating the Free Zone. Fidelity claims that Kasparian's approval of the incorrect destination amounted to a ratification of that destination by Banco di Roma. In this regard Fidelity relies upon *Barclays Bank D. C. O. v. Mercantile National Bank,* 481 F.2d 1224 (5th Cir. 1973), *cert. dismissed* 414 U.S. 1139, 94 S.Ct. 888, 39 L.Ed.2d 96 (1974) (hereinafter *"Barclays"*).

In *Barclays,* plaintiff sought to recover for the wrongful dishonor of a letter of credit by a confirming bank, Mercantile. The letter of credit in issue in *Barclays* expired on June 15, 1971. By letter to Barclays dated June 9, 1971, Mercantile dishonored drafts presented under the letter of credit. A crucial fact in *Barclays* was that this June 9 letter of dishonor acknowledged that the draft was accompanied "with all required documentation called for in the said Letter of Credit." Mercantile's dishonor on June 9 was, at that time, predicated on other grounds. At trial Mercantile for the first time raised the issue of deficiencies in documents. The Fifth Circuit held that:

> it is too late in the journey to raise this defect. Since Allied's letter of credit did

---

7. This practice of avoiding unnecessary repetition is so common that it is dealt with in a specific article of the UCP. *See* UCP Article 5.

8. This analysis disposes of the first defense asserted by Fidelity, that the tractors were not misdirected, and the second defense, that Banco di Roma's instructions were ambiguous.

9. These documents specified the destination as merely "Beirut".

10. It has been uniformly held that an issuing bank contracts to honor drafts drawn under a letter of credit only when such drafts are negotiated in strict compliance with the terms of the letter of credit. *See, e. g., Chase Manhattan Bank v. Equibank, supra* at 886; *Sisalcords Do Brazil, Ltd. v. Fiacao Brasileira De Sisal, S.A., supra* at 422; *Venizelos, S.A. v. Chase Manhattan Bank, supra* at 464. *Dynamics Corp. of America v. Citizens & Southern Nat'l Bank,* 356 F.Supp. 991, 995 (N.D.Ga.1973); *Marine Midland Grace Trust Co. v. Banco del Pais, S.A.,* 261 F.Supp. 884, 889 (S.D.N.Y.1966).

not expire until June 15, 1971, if Mercantile had notified Barclays on June 9, 1971, that the documentation furnished was improper, Barclays might have remedied the defect. To allow Mercantile to raise this defense, founded upon its own admitted mistake and after affirmatively stating that all required documentation was present, would not comport with our abstract sense of justice, nor, and more importantly, with the rule applied in cases involving letters of credit that "[b]y formally placing its refusal to pay on one ground, the defendant must be held to have waived all others." *Id.* at 1236.

■ The factual differences between the case at bar and *Barclays* indicate that *Barclays* is inapposite. First, presentation of the commercial invoice to Kasparian for his approval is not the equivalent of presentation to a bank for payment, as was the case in *Barclays*. Second, Kasparian's approval was contained in a letter from Consolidated to United, not to Banco di Roma. There is no indication that Banco di Roma ever even saw this letter which defendant claims constituted Banco di Roma's ratification of the incorrect destination. Third, defendant's theory ignores the fact that Fidelity's obligation to Banco di Roma was defined by the March 13 telex and that the terms of this agreement could not be modified except with the consent of all concerned.[11] UCP Article 3. Finally, it appears that Kasparian was United's agent,[12] not Banco di Roma's. Kasparian therefore had no power to modify or waive any terms of the Fidelity/Banco di Roma agreement.

■ Apparently realizing that United's agent could not effect a ratification in an agreement between Banco di Roma and Fidelity, Fidelity now puts forth the novel theory that since the letter of credit required Kasparian's approval, Kasparian became Banco di Roma's agent for the limited purpose of verifying the accuracy of the documents.[13] We cannot accept this theory. There are a multitude of reasons why a buyer would want to have his agent approve certain documents before shipping. One obvious possibility would be to insure merely that the correct equipment was being sent. Defendant would have us hold that whenever a letter of credit requires the prior approval of a document by any person that this approval waives any objections the issuing bank may have regarding the conformity of documents. Such a rule would effectively preclude a bank from ever complying with a customer's request that his agent approve some facet of a transaction when a letter of credit was involved.[14] No responsible issuing bank could take the risk that because of an incorrect approval by the buyer's agent the bank would be deemed to have waived all discrepancies in the documents *before the documents were even presented* to the bank.

It remains only to note that, unlike the situation in *Barclays*, Banco di Roma rejected the documents tendered on the basis of nonconformity in timely fashion. *See* UCC § 5–112(1)(a). Banco di Roma did not "lull [Fidelity] into believing that there was no problem with the documentation when there was still time for [Fidelity] to have

---

**11.** Fidelity appears to have overlooked this point in its first memorandum of law where it acknowledges that Kasparian was the agent of United. Brief for defendant at 32, 33, 34. United had no power to unilaterally modify the terms of the letter of credit, UCP Article 3, and United's agent could not possibly effect a "ratification" in an agreement that was only between Fidelity and Banco di Roma.

**12.** *See* Note 11, *supra*; Stephens deposition at 5 and statements of Mr. Pollack at oral argument.

**13.** Fidelity asserts this theory in its reply memorandum of law.

**14.** The facts of this case support the notion that a buyer may find it commercially desirable to have his agent approve certain facets of the sale transaction prior to shipment of the merchandise. Thomas Stephens, the president of Consolidated, stated that Kasparian was "the man that I had to work with in order to put these tractors on the piers." Deposition at 5. Stephens also testified that he and Kasparian negotiated the sale. *Id.* Significantly, Stephens and Kasparian never discussed the ultimate destination of the tractors. *Id.* at 6.

attempted to cure the technical defect and then turn around and assert the lack thereof as a defense to the suit on the draft." 481 F.2d at 1237. Fidelity's contention that Kasparian's approval constituted a ratification by Banco di Roma must therefore be rejected.

■ Fidelity's fourth defense is that its error caused no damage because the tractors arrived in Beirut in timely fashion. This defense overlooks the point stated earlier, that the parties here dealt in documents, not in goods. The only parties to this lawsuit are banks. The condition, time of delivery, etc., of the tractors is of no consequence in determining the rights and liabilities of the banks. The banks' sole concern is the documents. Therefore, that the tractors may have actually arrived in timely fashion is irrelevant when the issue is the correctness of the documents in a letter of credit transaction. *See, e. g., Courtaulds North America, Inc. v. North Carolina Nat'l Bank, supra* at 806.

The foregoing analysis reveals that Banco di Roma's rejection of the documents submitted by Fidelity was proper. Consequently, on May 9, 1975 Banco di Roma had a valid claim against Fidelity for reimbursement.[15] Anticipating this result, Fidelity asserts two additional defenses. First, Fidelity contends that Banco di Roma is estopped from recovery because it refused to assist in correcting the documents in order to designate the tractors Free Zone, which Fidelity alleges would have avoided all damages. Second, Fidelity asserts that Banco di Roma is barred from recovery because it refused to assist Fidelity in the sale of the tractors. To properly consider these defenses we must first look more carefully at the occurrences subsequent to May 9, 1975. Because this is a motion for summary judgment, we view these facts in a light most favorable to Fidelity.

After receiving Banco di Roma's May 9 telex rejecting the documents submitted under the letter of credit, Fidelity sought to have the status of the tractors changed to the Free Zone designation. An original Bill of Lading, which was in the possession of Banco di Roma, was required in order to effect this change swiftly. Fidelity therefore requested Banco di Roma's assistance in changing the designation of the tractors.[16] Banco di Roma failed to provide any assistance. Consequently the move to the Free Zone was delayed. Banco di Roma now contends that since the period of validity of the letter of credit had expired,[17] Banco di Roma had no duty to assist in having the tractors designated Free Zone because that could not retroactively cure the documentary defect. By telex dated June 20, 1975, Fidelity informed Banco di Roma that the tractors had been moved to the Free Zone and asserted that "it is our position that we have no further responsibility in this matter. We suggest that you immediately take whatever steps are necessary to secure the machinery."

For the next few months each party maintained that the other party was responsible for any loss involved. Fidelity, apparently proceeding in good faith, attempted to resolve the matter by finding a buyer for the two tractors. Since Banco di Roma possessed the documents of title to the tractors, Banco di Roma's cooperation was essential before any sale could take place. Banco di Roma, however, refused to cooperate with Fidelity on any possible sale until Fidelity first reimbursed Banco di Roma the $298,816.15.[18]

Fidelity now alleges that it produced three separate buyers, each of whom would have "absolutely" bought the tractors but for Banco di Roma's refusal to make the title documents available. There is some

**15.** By the time of the dishonor Fidelity had already obtained $298,816.15 from Banco di Roma through Chemical Bank.

**16.** Telex from Fidelity to Banco di Roma dated May 15, 1975.

**17.** The letter of credit expired April 30, 1975. Telex from Banco di Roma to Fidelity dated April 2, 1975, amending March 13 telex.

**18.** *See, e. g.,* Telex from Banco di Roma to Fidelity dated September 5, 1975.

documentary support for this claim.[19] Any one of these sales, Fidelity asserts, would have generated enough money to cover all claims by Banco di Roma.[20] We turn now to the legal effect of these allegations on Fidelity's liability.

Section 5–112(2) of the UCC provides that "[u]pon dishonor the bank may unless otherwise instructed fulfill its duty to return the draft or demand and the documents by holding them *at the disposal* of the presenter and sending him an advice to that effect." (emphasis added).[21] Having rejected the documents submitted by Fidelity, Banco di Roma informed Fidelity that it was holding the documents at Fidelity's "disposition."[22] In fact, however, Banco di Roma's willingness to hold the documents at Fidelity's disposition was conditioned upon prior reimbursement of the letter of credit amount.[23] We must therefore determine whether Banco di Roma acted properly in requiring reimbursement prior to holding the documents at Fidelity's disposition.

At the outset we note that neither UCC § 5–112 nor UCP Article 8 requires prior reimbursement as a condition to holding documents at the presenter's disposition. Moreover, allowing a bank to demand prior reimbursement before holding dishonored documents at the presenter's disposition is contrary to one of the express purposes of UCC § 5–112. Comment 2 to this section states:

> Many letters of credit involve transactions in international trade and include as required documents the documents of title controlling the possession of goods on their way to the place of issuance of the credit. The ordinary rule requiring physical return of dishonored documentary drafts (Section 4–302) would therefore frequently work commercial hardship on the mercantile parties to the transaction; resale of the goods might be more difficult if the controlling documents of title were not available at the place of arrival of the goods. Subsection (2) therefore expressly permits the issuer to retain the documents as bailee for the presenter if it advises the presenter of its retention for that purpose.

This Comment indicates that one of the purposes of UCC § 5–112 is to facilitate mitigation of damages through resale of the goods underlying the letter of credit agreement. The facts of the instant case illustrate only too well how a requirement of prior reimbursement can impede the mitigation of damages. While we now, with the benefit of hindsight, determine that Banco di Roma properly rejected the documents submitted by Fidelity, our review of the many telexes sent by the parties convinces us that Fidelity in good faith disputed the correctness of Banco di Roma's dishonor. Fidelity's posture subsequent to the dishonor of the documents was that "no matter who is at fault"[24] any damages resulting from United's rejection of the tractors should be minimized through transfer of the tractors to the Free Zone and through sale of the tractors. Banco di Roma, on the other hand, was steadfast in refusing Fidelity any cooperation until Fidelity first reimbursed Banco di Roma. We think that accepting Banco di Roma's position would be a bad rule, placing Fidelity between Scylla and Charybdis—either pay a contested claim before being allowed to mitigate damages or risk a much larger

---

19. Brief for defendant, exhibits W, X, Z, BB, FF, GG, HH.

20. Fidelity even goes so far as to suggest that one of the potential sales would have netted a $38,000 profit that Fidelity offered to Banco di Roma.

21. A similar provision is found in UCP Article 8.

22. *See, e. g.,* telexes from Banco di Roma to Fidelity dated May 9, 1975 and May 20, 1975.

23. This fact is made clear by Banco di Roma's telex of September 5, 1975 wherein it is stated that the "documents are held at your disposal by our said office and will be delivered only upon your instructions and *prior reimbursement* by you of their amount plus interests from April 18, 1975." (emphasis added).

24. Telex by Fidelity to Banco di Roma, dated July 24, 1975.

amount of damages should a court subsequently determine that Banco di Roma's dishonor was proper. Fidelity should not be compelled to make such an election. Banco di Roma should have held the documents at Fidelity's disposition, without precondition, and not impeded Fidelity's efforts to mitigate damages.

▮▮▮ Our conclusion is bolstered by analogy to the law of contracts. Prior tender of benefits received under a contract is not a precondition to the duty to mitigate damages. Even a party injured by a breach of contract is under a duty to mitigate damages. *Canada v. Allstate Ins. Co.*, 411 F.2d 517, 520 (5th Cir. 1969); *see Gurney Industries, Inc. v. St. Paul Fire & Marine Ins. Co.*, 467 F.2d 588, 595 (4th Cir. 1972). Thus, in an ordinary contract a party injured by a breach may be required to take affirmative steps in mitigation of damages without first receiving any restitution from the breaching party. Since in the instant case Banco di Roma was merely required to hold the documents at Fidelity's disposition,[25] as mandated by UCC § 5-112 and UCP Article 8, we can find no justification for its position that Fidelity was first required to reimburse Banco di Roma. Therefore, we must now determine the consequences of Banco di Roma's improper behavior.

Neither the UCC nor the UCP expressly provide for the situation where the issuing bank fails to hold the documents at the disposition of the presenter.[26] That no provision of the UCC directly governs the rights and liabilities of parties in this case does not, however, end our inquiry into the Code. Section 5-102(3) of the UCC provides:

[T]his Article deals with some but not all of the rules and concepts of letters of credit as such rules or concepts have developed prior to this act or may hereafter develop. The fact that this Article states a rule does not by itself require, imply or negate application of the same or a converse rule to a situation not provided for or to a person not specified by this Article.

Official Comment 2 to this section states, in part:

Subsection (3) recognizes that in the present state of the law and variety of practices as to letters of credit, no statute can effectively or wisely codify all the possible law of letters of credit without stultifying further development of this useful financing device.

· · ·

[Therefore] subsection (3) makes explicit the court's power to apply a particular rule by analogy to cases not within its terms, or to refrain from doing so.

▮▮▮ The process of developing a rule to govern a letter of credit case not within the literal language of any provision in the UCC has been used by the Fifth Circuit. *See Barclays, supra* at 1230-32. We will develop a rule to govern the instant case by drawing upon the established law of contracts. Because Banco di Roma's dishonor on May 9, 1975 was proper, Fidelity is in a position analogous to that of a party who has breached a contract. Banco di Roma's unwillingness to hold the documents at Fidelity's disposition is analogous to breach of the duty to mitigate damages. The burden of proving that losses could have been avoided is always upon the party who has

---

**25.** We need not decide whether a general duty of mitigation might be derived in an appropriate case through application of UCC §§ 1-201(1), 5-102(3) by treating the Code as a source of commercial law and not merely as a statement of individual rules. *See* S. Nickles, *Problems of Sources of Law Relationships Under the Uniform Commercial Code,* 31 Ark.L. Rev. 1 (1977); *cf.* H. Harfield, *Code Treatment of Letters of Credit,* 48 Cornell L. Q. 92, 97 (1962).

**26.** Because the parties agreed that this transaction would be governed by the 1962 revision of the UCP, we decline to apply the rule prescribed in § 8(f) of the 1974 revision of the UCP, which provides "[i]f the issuing bank fails to hold the documents at the disposal of the remitting bank, or fails to return the documents to such bank, the issuing bank shall be precluded from claiming that the relative payment, acceptance or negotiation was not effected in accordance with the terms and conditions of the credit."

broken the contract. *See* A. Corbin, 5 *Corbin on Contracts* § 1039 (1964). Accordingly, we find that Fidelity may reduce its liability by any amounts that it establishes could have been avoided had Banco di Roma held the documents at Fidelity's disposition.[27] We now proceed to apply this rule to facts of this case.

 Fidelity contends that Banco di Roma's unwillingness to assist in designating the tractors Free Zone should bar it from any recovery. We disagree. The period of validity of the letter of credit had already expired by the time Fidelity attempted to designate the tractors Free Zone. The error committed by Fidelity in the statement of the destination in the documents submitted under the letter of credit could not be corrected *nunc pro tunc. See Courtaulds North America, Inc. v. North Carolina Nat'l Bank, supra* at 807. Once the tractors were designated Free Zone, Banco di Roma could not have required United to accept them. Banco di Roma is thus not precluded from recovery for failure to assist in redesignating the tractors Free Zone. Banco di Roma's recovery will be reduced, however, by the additional customs duties which accrued as a result of the delay in designating the tractors Free Zone caused by Banco di Roma's failure to hold the documents at Fidelity's disposition.

Finally, if Fidelity is successful in proving its assertion that the tractors would have been sold but for Banco di Roma's failure to hold the documents at Fidelity's disposition,[28] then Fidelity's liability to Banco di Roma will be reduced by the amount of the obstructed sale.

---

27. Because we cannot determine the amount of avoidable damages at this juncture, summary judgment must be denied.

28. Of course Fidelity must also establish that any such sale would have been consummated before the tractors were destroyed.